CVI/BETA VENTURES, INC., Plaintiff,

v.

TURA LP, Brodart Co. and Bracken Opticians, Defendants.

MARCHON EYEWEAR, INC., Marcolin U.S.A., Inc., and Rothandberg, Inc., Plaintiffs,

v.

TURA LP, Brodart Co. and Arthur Brody, Defendants.

No. 91–CV–1710(SMG).

United States District Court, E.D. New York.

Nov. 13, 1995.

As Amended Nov. 29, 1995.

James J. Maune, Brumbaugh, Graves, Donohue & Raymond, New York City, for Plaintiffs CVI/Beta Ventures, Inc.

Edgar H. Haug, Curtis, Morris & Safford, P.C., New York City, for Plaintiffs Marchon Eyewear, et al.

Steven B. Pokitilow, Stroock Stroock & Lavan, New York City, for Defendants Tura LP, et al.

### MEMORANDUM AND ORDER

GOLD, United States Magistrate Judge.

## INTRODUCTION

Plaintiffs CVI/Beta Ventures, Inc. ("CVI/Beta") and Marchon Eyewear, Inc., Marcolin U.S.A., Inc., and Rothandberg, Inc. (collectively referred to herein as "Marchon") bring this action, charging that defendants Tura LP ("Tura"), Brodart Co. ("Brodart") and Arthur Brody ("Brody") (collectively referred to herein as the "Tura defendants") infringed two patents: United States Patent 4,772,112 (the " '112 patent") and United States Patent 4,896,955 (the " '955 patent"). The '112 patent was issued on September 20, 1988. On January 30, 1990, the '955 patent was issued as a continuation-in-part of the '112 patent. The two patents in suit claim an eyeglass frame with components made from nickel-titanium based shape-memory alloys having highly elastic properties.

Plaintiff CVI/Beta is the assignee, and plaintiff Marchon the licensee, of the suit patents. Plaintiffs contend in this action that Tura sold eyeglass frames which infringe both the '112 and the '955 patents, and that defendants Brodart and Brody induced Tura's infringement. Defendants contend that the patents are invalid and were not infringed, and have in addition asserted counterclaims under the antitrust laws.

This case was tried to a jury beginning on November 30, 1994. On December 22, 1994, the jury returned a verdict finding that the suit patents were valid, that defendant Tura infringed the patents but did not do so willfully, and that defendants Brodart and Brody induced Tura's infringement. The jury awarded plaintiff Marchon $14,085,093 in compensatory damages, representing $2,944,024 in profits on lost sales, $9,641,069 in profits lost as a result of depressed prices, and $1,500,000 in attorney's fees. The jury awarded plaintiff CVI/Beta $3,319,000, comprised of $819,000 in lost royalties and $2,500,000 in attorney's fees.

Several matters are currently pending before the Court. Defendants have moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50 or, in the alternative, for a new trial pursuant to Federal Rule of Civil Procedure 59. In addition, defendant Brody seeks dismissal, asserting that venue is not properly asserted over him in this district. Finally, the parties dispute the provisions appropriately included in a final judgment and order.

## DISCUSSION

### I. Construction of the Claim Term "3% Elasticity"

■ Defendants first assert that they are entitled to judgment as a matter of law that the accused eyeglass frames, marketed under the name Turaflex, do not infringe the patents in suit because they do not meet the elasticity requirements of the patent claims. This aspect of defendants' motion hinges upon the meaning of the terms "3% elastici-

ty" and "4% elasticity" as used in claims 1 and 5 of the suit patents.

## A. Background of the Dispute

The term "3% elasticity" appears in claims 1 and 5 of the '955 patent and in claim 5 of the '112 patent. The term "4% elasticity" appears in claim 1 of the '112 patent. Claim 1 of the '955 patent describes

> an eyeglass frame having at least a portion thereof fabricated from nickel-titanium based shape-memory alloy, said portion being in the work-hardened pseudo-elastic metallurgical state, said portion having been subjected to work-hardening and having a low effective elastic modulus giving a soft, springy feel, **said portion having greater than 3% elasticity** over a temperature range from −20°C to +40°C.

955:13:33—14:5 (emphasis added).[1] Claim 1 of the '112 patent is similar in all material respects, but refers to 4%, rather than 3%, elasticity. 112:12:14–22. Claim 5 as it appears in both the '112 and '955 patents describes

> [a]n eyeglass frame having at least a portion thereof fabricated from nickel-titanium based shape-memory alloy, ... and having a minimum of 3% heat-recoverable shape-memory, a yield strength greater than 30,000 psi **and at least 3% elasticity.**

112:12:33–41; 955:14:16–24 (emphasis added). The primary dispute between the parties concerns the meaning to be attributed to the terms "3% elasticity" and "4% elasticity," particularly in connection with the construction of Claim 1 as it appears in the suit patents. For purposes of this decision, the parties' dispute is discussed in the context of the construction to be given the term "3% elasticity."

Each party has advanced a different interpretation of the claim term "3% elasticity." Plaintiffs assert that "elasticity" describes "the ability or tendency of a given material to

recover or 'spring-back' to its original shape, partially or completely, after a deforming force is removed." Pl.Mem. at 9.[2] Defendants argue that the term elasticity describes the ability of a material to return completely and spontaneously to its precise original shape after a deforming force is released. Def.Mem. at 5.

As demonstrated by the undisputed evidence at trial, metallurgists use specific techniques for measuring the elasticity of metals. Simply put, the metal being tested for elasticity is pulled, and the pulling force, or stress, is then released. Measurements are made of the degree to which the metal is strained, or stretches when pulled, and the degree to which it recovers from that strain, or returns to its original shape, after the stress is released.

The parties agree that data developed by applying these measurement techniques are typically expressed in graphic form. These graphic depictions of elasticity are referred to as stress-strain curves. The stress to which the metal being tested is subjected, or the force with which it is pulled, is measured on the vertical axis of a stress-strain curve. The horizontal axis is used to plot the strain which the metal being tested exhibits at any given amount of force, or the degree to which it stretches when pulled and returns to its original shape when the pulling force is reduced or released. The strain is measured as a percentage of the tested item's original length. For example, a metal rod 100 centimeters long which stretches to 103 centimeters when pulled with 1000 pounds per square inch of force is said to exhibit 3% strain when subjected to a stress of 1000 pounds per square inch. Similarly, if the same rod, when pulled with a force of 1200 pounds per square inch stretched to 105 centimeters, the rod would be said to exhibit 5% strain when subjected to a stress of 1200 pounds per square inch. These percentages

1. The citation in the text is to the '955 patent at column 13, line 33 to column 14, line 5.

2. "Pl.Mem." refers to Plaintiffs' Opposition to Defendants' Motion for Judgment As A Matter Of Law Or In The Alternative For A New Trial. "Def.Mem." refers to Defendants' Memorandum of Law In Support Of The Defendants' Motion

for Judgment As A Matter Of Law Or In The Alternative For A New Trial, and "Def. Reply" refers to Defendants' Reply Memorandum In Further Support Of The Defendants' Motion for Judgment As A Matter Of Law Or In The Alternative For A New Trial.

are calculated by dividing the change in the length of the rod (3 centimeters and 5 centimeters, respectively) by the original length of the rod, which in this example is 100 centimeters.

The difference in the definitions of elasticity advanced by the parties concerns the behavior exhibited when the stresses on the rod are released. Plaintiffs assert that the term 3% elasticity refers to the ability of a metal item to "spring back" or recover in an amount equal to 3% of its original length after being subjected to stress. For example, to exhibit 3% elasticity as interpreted by plaintiffs, a metal rod 100 centimeters in length, after being stretched to a length of 105 centimeters when stressed, must, when the stress is released, "spring back" by an amount equal to 3% of its original length, or 3 centimeters, to a length of 102 centimeters.

According to defendants, 3% elasticity requires that a metal item return precisely to its original shape after being strained by at least 3% of its original length. In other words, to exhibit 3% elasticity as interpreted by defendants, a rod 100 centimeters in length, after being stretched to a length of 103 centimeters when stressed, would be required to recover fully and return spontaneously to its original length of 100 centimeters when the stress was released. (The behavior of the rod upon the release of stress after having been pulled to 105 centimeters is irrelevant to defendants' interpretation.) In contrast, while plaintiffs' definition would encompass full recovery from a 3% strain as one example of 3% elasticity, plaintiffs contend that any "springing back" of at least 3%, whether or not the component returns to its original shape, is sufficient to meet this element of the patent claims.

Prior to trial, plaintiffs moved for summary judgment on infringement and asserted, among other things, that defendants' frames exhibited more than 3% elasticity over the sixty-degree temperature range required by claim 1 of the suit patents. By Memorandum and Order dated November 21, 1994, this Court denied plaintiffs' motion for summary judgment, and permitted the parties to proceed to trial and argue their competing contentions about the meaning of

the disputed claim term to the jury. The verdict returned after trial indicates that the jury accepted plaintiffs' definition of the term.

After the trial of this case, the Federal Circuit issued its decision in *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed.Cir.1995), *cert. granted*, —— U.S. ——, 116 S.Ct. 40, 132 L.Ed.2d 921 (1995). The Court held in *Markman* that it was improper to allow a jury to decide the meaning of disputed claim terms. Although the Court in *Markman* acknowledged that some of its prior holdings indicated that "claim construction may have underlying factual inquiries that must be submitted to a jury," 52 F.3d at 976, it nevertheless held that the meaning of a patent claim is a question of law and, as such, must be resolved by the Court.

■ This Court's Memorandum and Order denying plaintiffs' motion for summary judgment on infringement addressed the parties' dispute over the meaning of the term 3% elasticity. After reviewing the specifications and the prosecution history of the suit patents, the definition advanced by defendants was determined to be correct. As this Court has made clear in the course of prior proceedings in this action, however, because the decision was to deny summary judgment, it has little or no precedential significance. Moreover, since rendering that decision, the Court has had the opportunity to review the specifications and prosecution history at great length, to hear testimony from experts about the meaning of technical terms, including elasticity, and to consider additional arguments made by the parties, both at trial and in connection with the motions now pending. Accordingly, the meaning of the patent terms in dispute is now reviewed *de novo*, without regard or reference to the discussion in the Memorandum and Order issued prior to trial.

■ The Federal Circuit's decision in *Markman*, which now requires this Court to decide the meaning of the claims in the patents in suit, offers guidance to Courts attempting to construe technical terms in a patent claim. The primary sources for determining the meaning of a patent claim are

the claim language itself, the patent specification and the prosecution history. In addition, the Court in *Markman* specifically held that "expert and inventor testimony ... may be helpful to explain scientific principles, the meaning of technical terms, and terms of art that appear in the patent and prosecution history." 52 F.3d at 979–81.

## B. The Language of the Patent Claims

The claims of the suit patents, quoted above, use the terms 3% elasticity and 4% elasticity without elaboration. Accordingly, standing alone, the language of the patent claims is of no assistance in resolving the definitional dispute between the parties.

Defendants assert that the commonly understood ordinary meaning of the term "elasticity" supports the definition they advance. In their memorandum, defendants recount the trial testimony of several witnesses, including John Krumme, Dr. Daniel Beshers, and Yuichi Suzuki, each of whom presented their own interpretation of elasticity. Def. Mem. at 6 n. 6. Defendants assert that the testimony cited in their memorandum establishes that the term elasticity is typically used to refer to the ability of a strained material to return to its original shape when the stress causing the strain is removed.

The testimony relied upon by defendants, however, is taken out of context. Krumme, one of the two inventors, and Beshers, plaintiffs' trial expert, testified that the term elasticity, particularly when used in the context of shape memory alloys like those described in the suit patents, refers to the ability of material to spring back towards its original shape, and not necessarily to return precisely to its original dimensions. Tr. 571 (Krumme), 966–67, 1207 (Beshers). Even Suzuki, who was called as a witness on behalf of the defendants at trial, described elasticity as "mean[ing] that the recovery power for it to return to its original shape is extremely great." Tr. 1640–41. Suzuki's definition suggests that materials with great, but not necessarily complete, power to return to

their original shape nevertheless exhibit elasticity.

More importantly, the real issue of claim interpretation presented by this case is not the meaning of elasticity in the abstract, but rather the meaning of a measure of elasticity expressed as a percentage. In other words, whatever elasticity may mean, the term 3% elasticity clearly means something less than, for example, 100% elasticity. Thus, even assuming that defendants are correct in their assertion that the term elasticity refers in general to the ability of a material to return to its original shape, the question of what behavior constitutes 3% elasticity remains.

## C. The Specifications of the Patents in Suit

As discussed above, elasticity measurements are frequently displayed in graphic form as stress-strain curves. The suit patents contain several such curves, labelled as figures 2A through 2H.[3] The parties each contend that the graphs contained in the suit patents, as well as the patent specifications,[4] support their respective definitions of the term 3% elasticity.

Defendants point in particular to figures 2F and 2H, and to passages taken from the specifications indicating that these graphs illustrate the properties of the invention described in claim 1 of the suit patents. Figures 2F and 2H depict materials which, having been strained by approximately 6% of their original length, return completely to their original shape when the stress upon them is released. The use of these figures in the patent specifications thus lends strong support to defendants' definition of the term 3% elasticity. Defendants further correctly assert that the patent specifications suggest that the behavior illustrated in figures 2F and 2H—spontaneous return precisely to original shape from strains of up to 6%—can be achieved by the claimed invention at temperatures as low as −20°C.

■ While it is certainly appropriate to consider a patent specification when constru-

---

3. The same graphs appear in both the '112 and '955 patents.

4. The term "specifications" is used in the plural to refer to the specifications of both the '112 and '955 patents.

ing a disputed claim term, it is not proper to read limitations into a claim from the specification. *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed.Cir.1985); *see also Markman*, 52 F.3d at 980 (noting that the specification "does not delimit the right to exclude. That is the function and purpose of the patent claims."); *Electro Medical Sys. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed.Cir.1994) (holding that "claims are not to be interpreted by adding limitations appearing only in the specification"). Figures 2F and 2H are therefore relevant only insofar as they inform the meaning of the term "3% elasticity," and not simply because the patent specifications in the suit patents suggest—even if inaccurately—that the behavior which these curves illustrate can be achieved by the claimed invention.[5]

For this reason, it is particularly noteworthy that the specifications do not describe figures 2F and 2H as illustrating 6% elasticity.[6] Rather, in the course of discussing a particular embodiment of the claimed invention, the specifications assert that these figures depict a "component [which] acts *completely elastically* up to strains of 6% or more." 112:5:25–26; 955:6:2–3 (emphasis added). Similarly, in connection with another embodiment, the specification of the '955 patent refers to a component which can be subjected to a "4% tensile strain and show *complete elastic spring back* at room temperature." 955:6:12–14 (emphasis added). Using the language of the specifications, then, had the inventors intended to use the term elasticity as defendants argue, they would have written a claim requiring that a component behave "completely elastically" or exhibit "complete elastic spring back" when subjected to stresses causing strains of at least 3% of original length. For these rea-

sons, this Court cannot agree that figures 2F and 2H, and the discussion of them in the specifications, compels the conclusion that 3% elasticity requires that a component return spontaneously and completely to its original shape.

In fact, when carefully reviewed in their entirety, the specifications and figures in the suit patents in fact provide persuasive support for plaintiffs' definition of 3% elasticity. This support derives in particular from the language of claim 5 and the discussion of figure 2G in the specifications. In both the '112 and '955 patents, claim 5 uses the same term—"3% elasticity"—which appears in claim 1 of the '955 patent.[7] When describing the behavior constituting 3% elasticity in the context of claim 5, the specifications use this term precisely as do plaintiffs in connection with the motions now pending before the Court. For example, the '112 patent describes an embodiment of claim 5 which provides "a fully recoverable strain potential of at least 6%." 112:5:45–46. In the text immediately following, it is further explained that this 6% recovery is comprised of "a minimum of 3% heat-recoverable shape-memory ... and at least 3% elasticity." 112:5:53–55. Thus, the '112 patent specification describes a component as exhibiting 3% elasticity even though the component retains a 3% strain recoverable only with the application of heat.

Similarly, the '955 patent, in discussing an embodiment of claim 5, describes a component which has been subjected to a 7.5% strain. This strain is completely recovered when, "upon unloading[,] the component gives 3.7% elastic spring back and imparts 3.8% shape memory recovery when heated." 955:6:60–62. The specification further states that "[f]rom the above, it can be seen [that

5. In considering whether the discussion of figures 2F and 2H in the specifications inaccurately implies that the claimed invention can achieve a spontaneous return to original shape from 6% strains over a sixty-degree temperature range, it should be noted that the specifications state that figures 2F and 2H represent "ideal characteristics." 112:4:45–46; 955:5:19.

6. Although there is a mention of the term "6% elasticity" at 955:6:24, it is clear from the context that this term is not being used to refer to the

behavior depicted in figures 2F and 2H. Moreover, the complete phrase, "greater than 6% elasticity," could not possibly be describing the behavior shown in figures 2F and 2H, because these figures illustrate behavior which, even by defendants' definition, would constitute slightly less than 6% elasticity.

7. As noted above, claim 1 of the '112 patent uses the term "4% elasticity," but is in all other material respects identical to claim 1 of the '955 patent.

eyeglass frame components may be made] ... having a minimum of 3% heat-recoverable shape-memory ... and at least 3% elasticity." 955:7:10–14. The reference to "3.7% elastic spring back" is the only behavior described in the text which could possibly support the conclusion that "from the above ... 3% elasticity [can be seen]." A second embodiment of claim 5 using similar language and providing similar support for the definition of 3% elasticity advanced by plaintiff is described at 955:6:63–955:7:9.

Clearly, then, the 3% elasticity described in the cited text of the '112 patent, and the 3.7% "elastic spring back" described in the cited text of the '955 patent, are provided as examples of the 3% elasticity required by claim 5. It is also clear that this elastic behavior must be combined with at least 3% "heat-recoverable shape-memory" behavior before the components, having been subjected to strains of 6% and 7.5%, respectively, return to their original shape. Thus, the term "3% elasticity," as it is used in claim 5, plainly does not require that a component return spontaneously and completely to its original shape. The same claim term, 3% elasticity, is of course used in claim 1, and cannot be consistently construed to require that a component spontaneously return to zero.

Defendants contend that the portions of the specifications discussed above do not support plaintiffs' definition of 3% elasticity. Rather, according to defendants, the heat-recoverable shape-memory and elasticity described in claim 5 are separate and distinct characteristics, each of which must be measured independently by straining a component to about 3% of its original length.

The cited portions of the specifications discussed above, however, demonstrate that the shape-memory and elasticity components of claim 5 are intended to operate in tandem upon an eyeglass frame subjected to strains in excess of 6% of original length. This construction of the shape-memory and elasticity elements of claim 5 is further supported by the references to figure 2G in the specifications of the suit patents. Figure 2G depicts a component which has been strained slightly less than 8%. When the deforming stress is released, the component springs back by almost 5%, with a strain of about 3% remaining. This remaining 3% strain is then recovered with heat, which returns the component to its original shape. Consistent with plaintiffs' definition of the term 3% elasticity, the specifications describe the "spring back" of 5%, from 8% strain to the remaining 3% strain, as illustrating the component's elastic properties. 112:3:23–24; 955:3:47–48. Furthermore, the specifications make it clear that figure 2G is intended to illustrate the behavior of a component covered by claim 5. 955:6:26, 35.

As discussed above, the '955 specification uses the phrase "spring back" to describe the behavior of a component which meets the requirement of 3% elasticity in claim 5. Moreover, the suit patents each employ figure 2G, which illustrates only a partial return toward original shape absent heat, to depict the "at least 3% elasticity" described in claim 5. It therefore follows that the term 3% elasticity as used in claim 5 refers not to the spontaneous return of a component to its original shape, but rather to the ability of a component to "spring back" by an amount equal to 3% of its original length. Moreover, the term is used in claim 5 precisely as it is used in claim 1, and there is no reasoned basis to apply different definitions to the same term used in two claims of the same patent. *See Southwall Technologies, Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1579 (Fed. Cir.1995), *petition for cert. filed,* 60 U.S.L.W. 3250 (Sept. 19, 1995) (No. 95–475); *Fromson v. Advance Offset Plate, Inc.,* 720 F.2d 1565, 1570 (Fed.Cir.1983) (holding that "evidence of the scope of a particular claim can be found on review of other claims"). This Court concludes, therefore, that the specifications support plaintiffs' contention that the 3% elasticity requirement in the claims of the suit patents is satisfied by a component which, upon the application of force, is strained in excess of 3% of its original length, and which, when the deforming force is released, springs back by at least 3% of its original length.

**D. The Prosecution History**

■ Defendants next assert that the prosecution history of the suit patents sup-

ports their definition of 3% elasticity. Like a patent specification, a patent's prosecution history may properly be considered when construing the language of a claim, but may not be used to vary the claim's limitations. *Markman,* 52 F.3d at 980. Accordingly, as with the specifications, the prosecution history is relevant only insofar as it indicates how the term "3% elasticity" was defined by the inventors and understood by the Patent and Trademark Office (the "PTO"). To the extent the inventors asserted during the prosecution history that their invention could achieve results even more impressive than those described in the patent's claims, such assertions, whether accurate or not, are not in and of themselves relevant to the claim construction question defendants now raise.

Defendants rely upon cited passages from several documents generated during the prosecution history in which the inventors emphasized the highly elastic properties claimed for their invention by referring to figures 2F and 2H and to the term "optimized elasticity." Defendants argue that these passages demonstrate that the inventors attempted to persuade the patent examiners that frames made pursuant to their patent would spontaneously return to their original shape when a deforming stress was released.

The documents cited by defendants, however, do not purport to define the claim term 3% elasticity or otherwise express a measure of elasticity in percentage terms.[8] Indeed, when describing pseudoelastic behavior, the inventors did not refer to a percentage of elasticity, but instead used the phrase, "the strain will spontaneously return to zero." PX 3 at 14.[9] Similarly, when describing the

behavior depicted in figure 2H during the prosecution history, the inventors did not describe that figure as illustrating 6% elasticity, but rather as depicting the behavior of "totally elastic" material. *Id.* Thus, when describing the ability of an item to return to its original shape—a behavior characteristic of pseudoelasticity and depicted in figure 2H—the inventors used terminology, such as spontaneous return to zero or total elasticity, which does not express elasticity as a percentage. The terms used by the inventors during the prosecution history thus support the conclusion that the claim terms, which do express elasticity as a percentage, do not require the complete and spontaneous return of an item to its original shape.

The only discussion of elasticity expressed in percentage terms which the Court has found among the prosecution history documents cited by the parties supports plaintiffs' definition of the term 3% elasticity. In a request for reexamination, the inventors discussed a prior art reference referred to as the "Mercier article." The inventors described a stress-strain curve in the Mercier article as illustrating a component strained by a deforming force to 11.1% which returns, or springs back, approximately 8.1% after the deforming stress is released. The request for reexamination describes this curve as illustrating 8.1% elasticity at the expense of a 3% retained strain. PX 3 at 19. (The 3% retained strain refers to the difference between the 11.1% strain to which the component was subjected and the 8.1% spring back exhibited by the component when the stress upon it was released.) Clearly, the inventors' statement to the PTO, describing a

---

**8.** Defendants argue that the inventors used the term optimized elasticity to mean the same thing as pseudoelasticity, and defined pseudoelasticity as the spontaneous return to original shape. Defendants correctly describe the inventors' definition of pseudoelasticity. 955:1:48–55. Defendants' contention that the inventors used optimized elasticity to mean the same thing as pseudoelasticity, however, is incorrect. The '955 patent specification specifically states that optimized elasticity is achieved by combining the pseudoelastic and superelastic properties of shape-memory alloys, and emphasizes that the terms pseudoelasticity and superelasticity refer to different properties. 955:1:36–44; 955:2:29–33. Similarly, at least once during the prosecution history,

the inventors described optimized elasticity as a combination of pseudoelasticity at higher temperatures and other properties at lower temperatures. This is reflected in a document cited by defendants, in which the inventors discussed

> the optimized elasticity combination of properties which utilize the soft pseudoelastic effect in concert with a resistance to turning weak and staying bent when deformed at a temperature below the material's transformation temperature.

DX 17B at 6–7.

**9.** PX 3 refers to plaintiffs' trial exhibit 3. DX is used herein to refer to defendants' trial exhibits.

component which recovered only partially when stress was released as exhibiting 8.1% elasticity, supports plaintiffs' interpretation of 3% elasticity.

Defendants argue in their reply that the inventors' discussion of Mercier was based upon an inaccurate reading of the defendants' position during the reexamination proceeding. More specifically, defendants contend that it was their position on reexamination that the Mercier curve did not depict any retained strain. Def.Reply at 23 n. 15. Even assuming that defendants are correct in this regard, plaintiffs' misunderstanding has no bearing on the proper construction of the claim term in dispute. The significance of the statements made by the inventors during the prosecution history about the Mercier curve does not depend upon the accuracy or persuasiveness of their arguments about the curve, but instead upon the meaning attributed by the inventors to the expression of elasticity in percentage terms. It is clear that, in the passage from the prosecution history cited above, the inventors argued to the PTO that the curve in Mercier depicted a retained strain, yet nevertheless characterized that curve as illustrating 8.1% elasticity. The description of a stress-strain curve which is understood to depict a component which only partially returns to its original shape as exhibiting 8.1% elasticity supports the definition of 3% elasticity advanced by plaintiffs.

### E. The Extrinsic Evidence At Trial

As noted above, the Court in *Markman* specifically held that expert testimony may be helpful to explain scientific principles and the meaning of technical terms. 52 F.3d at 979–81. Dr. Daniel Beshers, who has been a professor of metallurgy and material science at Colombia University since 1957, testified for plaintiffs as an expert at trial. In the course of his testimony, Beshers stated that

elasticity expressed as a percentage, particularly when discussing shape memory alloys, is widely understood to refer to the ability of a component to "spring back" upon the release of stress to a degree indicated by the percentage of elasticity stated. Tr. 966–67, 1157, 1160.[10] Beshers' expert opinion thus supports the definition of 3% elasticity advanced by plaintiffs.

Defendants argue that, because Beshers is not one of ordinary skill in the art, his expert opinion should have no bearing upon the construction of the disputed claim language. Beshers, however, testified that the definition he gave at trial was "universal" and that "everybody would agree to [it]," and that it was "widely recognized" as an accurate definition in the context of shape memory alloys. Tr. 1157, 1160. Moreover, Beshers testified that he had little experience with or specialized knowledge of shape memory alloys and their properties before he was retained by plaintiffs, he devoted special study to the subject, particularly in connection with the fabrication of eyeglass frames, after plaintiffs engaged him. Tr. 949–50, 952. Presumably, one of ordinary skill in the art—a fabricator of metal eyeglass frames lacking detailed familiarity with shape-memory alloys—would undertake a similar course of study and investigation. Finally, defendants offered no evidence at trial that one of ordinary skill in the art would, by virtue of training and experience, understand the term 3% elasticity differently than did Beshers.[11] Accordingly, I conclude that it is appropriate to consider Beshers' expert testimony about the meaning of the term 3% elasticity.

\* \* \*

Based upon the language of the claims of the suit patents, the specifications and drawings they contain, the history of their prosecution and the extrinsic evidence at trial, this Court concludes that the term 3% elasticity

---

10. The reference at Tr. 1157:21 to 97 millimeters should read "197 millimeters."

11. The only expert testimony about the meaning of elasticity presented by the defendants at trial was the testimony of Walter Johnson. Like Beshers, Johnson had little or no experience with shape memory alloys prior to being retained in this case, and had no experience whatsoever

with the fabrication of eyeglass frames. Tr. 2224–25. Accordingly, Johnson was no more one of ordinary skill in the art than was Beshers. Moreover, Johnson opined during his testimony in any event that "there [are] as many definitions of elasticity as there are metallurgists." Tr. 2236.

is properly construed to refer to the behavior exhibited by a component which, when strained by a deforming force to a length in excess of 3% of its original length, springs back by at least 3% of its original length when the force is released. Defendants' contention that the evidence at trial was insufficient to support the jury's finding that their products exhibited 3% elasticity as required by claim 1 is premised upon the definition of that claim term advanced by defendants. That definition having been rejected for the reasons stated above, defendants' motion for judgment as a matter of law on this ground is denied.

## II. *Elasticity and Shape–Memory Requirements of Claim 5*

Claim 5 of both the '112 and '955 patents describes an eyeglass frame with a component which has "a minimum of 3% heat-recoverable shape-memory ... and at least 3% elasticity." Defendants argue that the evidence presented at trial was insufficient to support the jury's finding that these claim elements were infringed.

Defendants' contention that the evidence at trial was insufficient to establish that the accused frames have 3% elasticity is premised upon the same construction of that claim term which is rejected in Point I of this Memorandum and Order. Accordingly, for the reasons stated above, this aspect of defendants' motion must be denied.

■ Defendants now assert for the first time that the evidence at trial was also insufficient with respect to the heat-recoverable shape-memory element of claim 5. In two written motions dated December 12, 1994, defendants sought a directed verdict on several specifically stated grounds. Defendants did not, however, seek judgment as a matter of law on any ground related to the "3%

heat-recoverable shape memory" element of claim 5.[12] Defendants' failure to raise this basis for relief during trial bars their post-trial motion for judgment as a matter of law. *See, e.g., Lambert v. Genesee Hosp.,* 10 F.3d 46, 53–54 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994) (emphasizing that the rule is designed to protect a party's right to "notice of potential deficiencies in its proof before the case is submitted to the jury"); Fed.R.Civ.P. 50(a), Advisory Committee's Notes to 1991 Amendment.

■ With respect to virtually every ground on which they seek judgment as a matter of law, defendants in their post-trial motion contend that they are entitled in the alternative to a new trial pursuant to Fed. R.Civ.P. 59. Although the failure to seek a directed verdict during trial does not procedurally bar a motion for a new trial, such a motion should be granted only to prevent manifest injustice. *See, e.g., Baskin v. Hawley,* 807 F.2d 1120, 1134 (2d Cir.1986); *Russo v. State of N.Y.,* 672 F.2d 1014, 1022 (2d Cir.1982), *modified on reh'g,* 721 F.2d 410 (2d Cir.1983); 6A Moore's Federal Practice ¶ 59.08[5] at 59–150—59–152. Defendants, having failed to raise their contentions at a time when plaintiffs might have cured any asserted insufficiency in their proof, have not presented arguments which warrant granting them a new trial.

■ Finally, even if this Court were to reach the merits of defendants' motion with respect to heat-recoverable shape-memory, the motion would be denied. Defendants' position is premised upon a construction of this claim term which would require an accused frame component to return completely and precisely to its original shape. Def. Mem. at 33.[13] This Court has already reject-

12. In response to plaintiffs' contention that defendants waived their right to raise the sufficiency claims they now advance (Pl.Mem. at 39–40), defendants point out that their arguments about the meaning of the term 3% elasticity as used in claim 5 were raised in their motion for a directed verdict. Def. Reply at 36. Defendants, however, point to no indication that they raised the argument they now make regarding the heat-recoverable shape-memory aspect of claim 5 during trial.

13. Defendants support their argument by reference to portions of the trial testimony of plaintiff's expert, Dr. Beshers. At least one of these references, however, refers to Turaflex frame Model 874. Def.Mem. at 33. Plaintiffs did not contend at trial, however, and the jury did not find, that this model infringed claim 5 of either the '112 or '955 patents.

ed the defendants' contention that elasticity, expressed in percentage terms, requires a complete return to original shape. There is no reason to construe a statement of heat-recoverable shape-memory expressed in percentage terms any differently.

For these reasons, defendants' motion for judgment as a matter of law, or in the alternative for a new trial, on grounds that there was insufficient proof at trial to support the jury's verdict with respect to the elasticity and heat-recoverable shape-memory elements of claim 5, is denied.

### III. *Infringement of Claims 1 and 5 by the Same Component*

██ The jury found that four of defendants' frames infringe both claims 1 and 5 of the suit patents. Defendants contend that these patent claims are irreconcilably inconsistent, and that any verdict finding that an accused product infringes both must therefore be set aside.

Defendants make four arguments in support of their contention that it is not logically possible for one product to infringe both claims 1 and 5 of the patents in suit. First, defendants argue that the specifications indicate that frames exhibiting the characteristics of claim 1 should be made by subjecting the frames to work-hardening and avoiding subsequent anneals, whereas frames intended to behave as described in claim 5 should be subjected to heat treatment during fabrication. Second, defendants assert that, during the prosecution of the suit patents, the inventors indicated to the PTO that the shape memory alloys best used to fabricate components intended to behave as described in claim 1 and those suitable for making frames with the characteristics listed in claim 5 have different transformation temperatures. Third, defendants point to portions of the specifications indicating that claim 1 frames have a yield strength greater than that of claim 5 frames. Finally, defendants rely upon a licensing agreement and correspondence authored by an employee of plaintiff CVI/Beta as evidence that the plaintiffs conceived of claims 1 and 5 as describing separate and distinct eyeglass frame components.

██ The purported inconsistencies relied upon by defendants are not irreconcilable. Claim 1 does not include an element requiring or precluding anneals or heat treatments. Neither claim 1 nor claim 5 specifies the transformation temperature of the shape memory alloy from which the patented frame component is to be fabricated. Claim 1 does not require a minimum yield strength, and claim 5 does not impose a maximum. In short, defendants' attempt to impugn the jury's findings as irreconcilably inconsistent relies upon a reading of limitations into claims 1 and 5 from the specifications and the prosecution history of the suit patents, despite the complete absence of words in the claims themselves which would support such limitations. This is plainly improper. *SRI Int'l.*, 775 F.2d at 1121; *see also Markman*, 52 F.3d at 980; *Electro Medical Sys.*, 34 F.3d at 1054. Moreover, even assuming that plaintiffs did not contemplate manufacturing or marketing frame components which exhibited the characteristics of both claims 1 and 5, this would not render the jury's verdicts irreconcilably inconsistent. An inventor's decision to exercise his patent rights by marketing separate claim-specific products in no way bars a jury from concluding that an accused product simultaneously infringes two claims of the same patent.

Defendants have failed to establish that claims 1 and 5 contain irreconcilably inconsistent terms. Accordingly, the motion to set aside the jury's verdict on this ground is denied.

### IV. *Yield Strength*

██ Claim 5 of the suit patents requires that a frame component have "a yield strength greater than 30,000 psi." '112:12:40–41; '955:14:24–25. Defendants argue that this claim term should be interpreted to require a component to exhibit the stated yield strength at a temperature at which 3% heat recoverable shape-memory and elasticity occurs, i.e., at −20°C, and that the evidence presented at trial was insufficient to support the jury's finding that the Turaflex frames possessed the required yield strength at that temperature.

Defendants argued that claim 5 should be interpreted to require the stated yield strength at −20°C in their motion for a directed verdict. Defendants have not presented any evidence or posed any arguments which this Court did not thoroughly consider before denying defendants' motion for a directed verdict at the close of the evidence at trial. Tr. 2915:23–2917:16; 2926:11–19. The reasons for denying that motion are nevertheless amplified below.

## A. Claim Construction

Although claim 1 expressly requires that a component exhibit certain characteristics over a stated temperature range, there is simply no mention of a temperature range requirement in claim 5. In light of the temperature range requirement in claim 1, it is clear that the tendency of shape-memory alloys to behave differently at different temperatures was neither overlooked by the inventors or the PTO, nor beyond their ability to address with claim requirements. The absence in claim 5 of a limitation with respect to temperature makes it clear from the plain language of the claim terms that no such limitation was intended.

Defendants assert, however, that the specifications of the suit patents indicate that the yield strength requirement of claim 5 must be met at temperatures as low as −20°C. While it is "proper to use the specification to interpret what the patentee meant by a word of phrase in the claim," it is not proper to add "an extraneous limitation appearing in the specification." *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.,* 849 F.2d 1430, 1433 (Fed.Cir.), *cert. denied,* 488 U.S. 986, 109 S.Ct. 542, 102 L.Ed.2d 572 (1988). An extraneous limitation is one which is "read into a claim from the specification wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim." *Id.* In other words, the language contained in the patent specifications may be used only to interpret ambiguous claim terms, and not to impose

additional limitations on the claims. *See SRI Int'l.,* 775 F.2d at 1121.

In this case, the phrase "a yield strength greater than 30,000 psi" as used in claim 5 clearly makes no reference to a temperature range. Accordingly, it is not proper to look to the patent specifications to determine whether or not claim 5 requires that a component possess this yield strength at any specific temperature.

Moreover, the portions of the specifications cited by defendants do not require that an alloy possess the yield strength stated in claim 5 at temperatures as low as −20°C. Defendants rely upon a statement in the specifications that work-hardening, followed by partial annealing, results in a component that, "below $M_s$, has a combination of higher yield strength, very springy elastic behavior, and some shape-memory characteristics." [14] 955:6:31–34. Although this portion of the patent specification discusses the yield strength of an alloy below its $M_s$ temperature, there is no indication in the specification that the $M_s$ temperature referred to is as low as −20°C. Indeed, in discussing the shape memory features of the frame components for purposes of Claim 5, the specifications refer to figure 2G, which depicts the behavior of an alloy at some point below $M_s$, but in no way indicates that the alloy has an $M_s$ temperature as low as or close to −20°C. 955:5:37–41.

The only temperature range requirement imposed by the suit patents is the −20°C to +40°C range over which claim 1 requires that a component exhibit at least 3% elasticity. The discussion of claim 1 in the specifications of the suit patents indicates that the $M_s$ temperature does not necessarily approach −20°C. Rather, the $M_s$ temperature depends upon the alloy selected. In discussing Claim 1, the patent specifications describe the behavior of frame components at temperatures below $M_s$, which may fall above −20°C. 955:5:37–40, 50–61. Thus, even if the specifications were read to impose a limitation on claim 5, they might arguably require only that a frame component possess

---

**14.** $M_s$ is used in the patent specifications to refer to a transformation temperature of a shape memory alloy.

the stated yield strength at some temperature below $M_s$, but not necessarily at temperatures as low as $-20°C$.

Defendants next assert that plaintiffs implicitly conceded that Claim 5 requires an alloy to possess the stated yield strength at $-20°C$ by seeking a finding of infringement with respect to Turaflex Model 841 under the doctrine of equivalents. The evidence at trial presented by plaintiffs established that the yield strength of this frame at $-20°C$ was below the 30,000 psi required by claim 5. Defendants reason that, had plaintiffs asserted that claim 5 required only that the 841 possess the requisite yield strength at any temperature, plaintiffs would have sought to prove literal infringement by relying upon tests which demonstrated that Model 841 had a yield strength of 52,000 psi at 40°C. Plaintiffs' attempt to demonstrate at trial that the 841 exhibited the requisite yield strength at $-20°C$, however, does not compel this Court to read such a limitation into claim 5, which itself contains no reference to temperature which even arguably applies to yield strength. Accordingly, I conclude that claim 5 should not be construed to require that its stated yield strength requirement be met at $-20°C$.

Defendants do not challenge the sufficiency of the evidence at trial that the accused frame components possessed the required yield strength at higher temperatures, nor could they. The jury, reading the plain language of claim 5, might well have concluded that the yield strength requirement stated in claim 5 need not be met at $-20°C$, and relied upon Beshers' test results at higher temperatures, indicating yield strengths well in excess of 30,000 psi. PX 20.[15] These results provided ample support for the jury's finding that the accused frame components infringed the yield strength element of claim 5.

### B. Sufficiency of the Evidence

■■■ As noted above, defendants correctly assert that plaintiffs attempted to prove at trial that the frame components accused of infringing claim 5 possessed the yield strength required by that claim at temperatures as low as $-20°C$. Defendants contend that the proof at trial on this issue was insufficient to support the jury's infringement finding. Even if claim 5 were interpreted to require that an alloy possess the stated yield strength at $-20°C$, the evidence presented at trial by plaintiffs would be sufficient to support the jury's verdict.[16]

Plaintiffs' proof of yield strength was presented through the testimony of Dr. Beshers, who described various tests he performed on the accused frame components. Defendants challenge all of Beshers' findings, and in particular those at cold temperatures. Defendants assert that Beshers' findings are unsupported and conclusory, and based upon testing techniques so flawed that no reasonable juror could have relied upon them. More specifically, defendants assert that Beshers artificially inflated the yield strength of the Turaflex samples by testing them at $-20°C$ only after having subjected them to several tests at higher temperatures. According to defendants, these prior tests at higher temperatures themselves increased the yield strength of the tested alloy, thereby artificially inflating the results of the tests performed at $-20°C$.

Dr. Beshers' testimony, however, was hardly conclusory. Beshers explained the procedures he used to determine the yield strength of the Turaflex frames at great length during both his direct testimony and upon cross-examination. *See, e.g.,* Tr. 966:2–17; 980:20–992:15, 1003:6–12, 1025:21–1026:5, 1140:18–1148:10. Moreover, plaintiffs intro-

---

**15.** Beshers' data at higher temperatures, with a substantial margin for error and obtained before several cycles of tests were performed, are not subject to the attack levelled by defendants, discussed below, at the results which Beshers obtained at $-20°C$.

**16.** Plaintiffs acknowledge that Beshers' test data established that the yield strength of the Turaflex 841 at $-20°C$ was 28,000 psi and not the 30,000 psi required under Claim 5. The jury's finding

that this frame infringed the yield strength element of claim 5, however, was returned under the doctrine of equivalents, and was supported by relevant testimony of equivalence from Dr. Beshers. Tr. 1149:4–1150:4. Defendants' challenge to the propriety of submitting this issue and others to the jury under the doctrine of equivalents is addressed in Point VI of this Memorandum and Order, below.

duced into evidence the test samples and documents reflecting the test results from which Beshers calculated the yield strength of the accused Turaflex frames. PX 8–21.

The reliability of Beshers' testing procedures was addressed in detail at trial and properly submitted to the jury. Beshers testified that the repeated testing at higher temperatures emphasized by the defendants did not significantly affect his results at −20°C. When asked on cross-examination whether he was "concerned" that performing repeated tests—three cycles at room temperature, one cycle at 40°, one cycle at 0° and finally two cycles at −20°C—undermined the accuracy of his results, Beshers responded that repeated test cycling did not change the properties of the material being tested. Tr. 1098:18–24. Even after being questioned about the differences in the tensile strengths of the sample frames after each test cycle, Beshers stood by the opinions he rendered to the jury. Beshers stated that there was nothing about the questions he was asked or the documents which he reviewed which would cause him to alter his conclusions that the Turaflex frames met the yield strength requirement of Claim 5 of the suit patents. Tr. 1206:18–1207:3.

The jury had the opportunity to consider Beshers' credentials, to observe his demeanor, and to evaluate the testing procedures he followed and the results he obtained. During his testimony, Beshers stated his opinion that the purported flaws in his test procedures relied upon by defendants did not affect the accuracy of his results. The jury was entitled to rely upon Beshers' opinion in this regard. Fed.R.Evid. 702.[17] Accordingly, even if claim 5 were interpreted to require an alloy to possess the stated yield strength at −20°C, the evidence would be sufficient to support the jury's conclusion that the accused frame components met the yield strength requirement of the patents in suit.

## V. *Work–Hardening*

### A. Construction of Claim 1 of the '955 Patent

■ Claim 1 of the '955 patent describes "[a]n eyeglass frame having at least a portion thereof . . . in the work-hardened pseudoelastic metallurgical state, said portion having been subjected to work-hardening." 955:13:33–14:2. The parties dispute the meaning of this phrase.

Defendants contend that this claim term should be interpreted to require work-hardening of a shape-memory alloy while it is at a temperature at which it is pseudoelastic, i.e., at a temperature between $M_s$ and $M_d$.[18] This construction of the claim would require that an alloy be subjected to work-hardening while in a particular metallurgical state, but would not require that the finished component be in any particular state of work-hardening. Plaintiffs assert that the phrase "work-hardened pseudoelastic metallurgical state" describes a final state of an alloy and not a processing step. Plaintiffs argue, therefore, that the phrase should be construed to require that a finished product exhibit residual work-hardening and, within the appropriate temperature range, exhibit the characteristics of pseudoelasticity as well.

Defendants did not move for judgment as a matter of law on this ground during the trial. Accordingly, they may not now raise this issue as a basis for such relief. Fed. R.Civ.P. 50.

Moreover, defendants' argument lacks substantive merit. The ordinary meaning of the phrase "work-hardened pseudoelastic metallurgical state" supports the interpretation advanced by plaintiffs. The term "work-hardened" modifies the term "state," and thus clearly indicates a description of a finished product in a particular state, rather than a processing step which must be performed at a specific point during the fabrication of a frame component.

17. Defendants support their argument by referring to the test results obtained by their expert, Walter Johnson. Clearly, however, it was within the jury's province to credit Beshers' testimony and reject the testimony provided by Johnson.

18. $M_d$, like $M_s$, refers to a transformation temperature of a shape memory alloy.

This interpretation of the claim's ordinary meaning is further supported by the remaining terms of the claim. Claim 1 includes a process limitation—that the component have been "subjected to work-hardening"—which appears in the claim immediately following the term in dispute. This process limitation does not require that the work-hardening take place at any particular temperature or at any specific stage of fabrication.

Moreover, had the phrase "work-hardened pseudoelastic metallurgical state" been intended to require that a component be subjected to work-hardening while in its pseudoelastic state, there would be no reason for claim 1 also to require that the component be "subjected to work-hardening", because a component in the work-hardened pseudoelastic metallurgical state would necessarily have been work-hardened. In other words, while it is redundant to require a frame component to be work-hardened at a particular temperature, and then in addition to require generally that the component be work-hardened, it is not redundant to require that a component be subjected to work-hardening during its fabrication and to require as well that the component still be in a work-hardened metallurgical state when completed. Thus, the inclusion of a work-hardening process limitation following the disputed phrase compels the conclusion that an alloy in the "work-hardened pseudoelastic metallurgical state" must exhibit residual work-hardening and pseudoelastic characteristics in its completed state, and not that the work-hardening must occur while the material is at a temperature in its pseudoelastic range.

The interpretation advanced by plaintiffs is also supported by the specification of the '955 patent. In describing the behavior of an alloy at temperatures between $M_s$ and $M_d$, the specification states that the alloy will behave as depicted in figure 2H of the patent, which is described by the inventors as representing work-hardened pseudoelasticity. 955:5:16–19. The specification states that "Figure 2H shows the stress-strain behavior of a martensite alloy at $M_s < T < M_d$, ...

which alloy has been work-hardened." [19] 955:3:51–54. Thus, the specification describes figure 2H as an example of the behavior of an alloy which is "work-hardened pseudoelastic" and states in addition that the alloy has been work-hardened. There is no indication in the specification, however, that the work-hardening must take place at any specific stage during processing. Thus, these passages in the '955 patent specification indicate that the disputed phrase is intended to describe the characteristics of a finished product rather than a step in its fabrication.

The expert testimony presented at trial also supports plaintiffs' interpretation. As noted above, it is proper for a court to rely upon expert testimony to explain the meaning of technical or scientific terms, or of terms of art used in patent claims. *Markman*, 52 F.3d 980–981. Because the phrase "work-hardened pseudoelastic metallurgical state" is clearly a term of art used by those knowledgeable about material sciences, it is appropriate for this Court to consider the expert testimony of Dr. Beshers, a professor of metallurgy and material science. When asked at trial to describe the meaning of the phrase "work-hardened pseudoelastic metallurgical state," Beshers testified that

> [t]he term 'state' at the end refers to the condition or state of the material ... It need not be attained in the same way all the time ... that state is work-hardened; that is, the structure has been changed by applying forces to it to produce the work hardened state and in the work hardened state it exhibits the pseudoelastic characteristics which we said goes with shape-memory alloys in a certain temperature range.

Tr. 972. Beshers was then asked to interpret the phrase "having been subjected to work-hardening." Beshers stated that, as he testified with respect to the phrase "work-hardened pseudoelastic metallurgical state," that "there's an implication in state, perhaps there may be more than one way to arrive at that final state, but [the phrase 'having been

---

**19.** T is used in the specifications of the suit patents to refer to the temperature of a shape memory alloy.

subjected to work-hardening'] now says clearly some work hardening is to be included in the process that leads to the final state." Tr. 972. Beshers testified specifically that it was not necessary to work-harden material that is already in the pseudoelastic state to achieve the properties depicted in figure 2H of the patent, which as discussed above is described in the patent specification as "work-hardened pseudoelastic." Tr. 1095:22–1096:10. (Defendants' material science expert, Walter Johnson, did not testify about the proper interpretation of the disputed phrase.)

Defendants assert that the prosecution history supports their position, and point to several statements made by the inventors to the PTO indicating that desired properties can be achieved by work hardening an alloy while the alloy is in its pseudoelastic state. *See* PX 3, plaintiff CVI/Beta's Request for Reexamination, at 6 (stating that a "component *work-hardened in the pseudoelastic state* provides a desirable degree of comfort of wearing ...,") and at 10 (distinguishing the patented invention from prior art by stating that "the work-hardening occurs at a different temperature relative to its transformation temperature, i.e., it occurs on martensitic material as opposed to the inventive material which is *work-hardened* in its *pseudoelastic state* ") (emphasis in original); DX 16, Second Preliminary Amendment to '955 Patent, at 2 (stating that work-hardened pseudoelastic metallurgical state, also referred to as optimized elastic, "is due to the work hardening of a pseudoelastic material").

Other portions of the prosecution history, however, support the claim construction advanced by plaintiffs. In their Second Preliminary Amendment, for example, the inventors asserted that they were attempting to make it clear that claim 1 describes a frame in the work hardened pseudoelastic state which has been "subjected generally" to work-hardening. DX 16 at 2. The use of the word "generally" suggests that the work-hardening need not be performed while the alloy is in its pseudoelastic state.

In any event, the claim language is clear and unambiguous and supported by the specification of the '955 patent and the expert testimony at trial. Moreover, the patent examiner did not require the inventors to amend claim 1 to require specifically that work-hardening take place at a point during fabrication at which an alloy is in its pseudoelastic metallurgical state. Accordingly, the prosecution history references on which defendants rely do not compel the construction of the claim language they advance.

For these reasons, the Court declines to construe the phrase "work-hardened pseudoelastic metallurgical state" to require, as defendants urge, that the work-hardening processing step occur while the component is in its pseudoelastic state. Rather, the Court construes the claim language in dispute to require only that the finished component possess a metallurgical structure showing residual work-hardening and, within the appropriate temperature range, exhibit pseudoelastic behavior.

**B. Sufficiency of the Evidence**

Defendants assert that the evidence at trial was insufficient to allow the jury to conclude that the accused frame components were in the "work-hardened pseudoelastic metallurgical state," as claim 1 of the '955 patent requires. Defendants' argument is premised upon a construction of the claim which, for the reasons discussed above, the Court has rejected. Accordingly, defendants' motion in this regard must be denied.

Defendants further contend that the evidence at trial was insufficient to support the jury's finding that the work-hardening requirement of Claim 1 of the '112 patent was infringed. The '112 patent claims a frame having a portion that has been "subjected to at least 30% work-hardening." 112:12:17–18. Having failed to move for judgment as a matter of law on this ground during the trial, defendants are barred from raising this issue now. Fed.R.Civ.P. 50. Moreover, defendants' contention should be rejected on its merits.

As discussed above, whether an accused product is covered by the claims of a patent is properly resolved by a jury. *See Read Corp. v. Portec, Inc.*, 970 F.2d 816, 822 (Fed.Cir.1992) (*citing Winans v. Denmead,*

56 U.S. 330, 338 (15 How. 330), 14 L.Ed. 717 (1854)). To overturn a jury verdict, a party must demonstrate that the jury's factual findings were not supported by substantial evidence. *Id.* at 821. This "raises the question of whether the jury's resolution of a factual dispute was reasonable." *Id.*

Plaintiffs' proof that the work-hardening requirement of Claim 1 of the '112 patent was infringed was presented by Dr. Beshers, who described the results of his testing and examination of the accused frame components. Defendants assert that this evidence was insufficient for two reasons. First, defendants contend that Beshers' results were based on several assumptions, rendering his results entirely speculative. Second, with respect to Turaflex frame Models 841, 868, 869, 870, 871 and 877, defendants argue that Beshers' tests revealed that these frames were subjected to less than the 30% work-hardening required by claim 1.

At trial, Dr. Beshers described the method by which he measured the allegedly infringing Turaflex frame components to determine whether they satisfied the work-hardening requirement of Claim 1 of the '112 patent. Beshers stated that he calculated the percentage of work-hardening to which a particular component had been subjected from its geometry, and that any assumptions he made were conservative ones. Tr. 1023–25.

Beshers' test results were summarized in a chart which was admitted into evidence as PX 32A. As defendants point out, although the six frames with allegedly infringing temples were each found to have been work-hardened in excess of 30%, the three models with allegedly infringing brows were calculated to have been work-hardened from 23% to 28%. As stated above, however, Beshers testified that his results were based on the most conservative assumptions possible, and opined that the Turaflex model frames at issue each infringed the 30% work-hardening requirement of Claim 1 of the '112 patent. *See* PX 439. Defendants' expert, Walter Johnson, did not render an opinion regarding the 30% work-hardening requirement. Accordingly, a reasonable juror could have concluded, from Beshers' testimony and the conservative assumptions on which it was based,

that it was more likely than not that the Turaflex frames met the work-hardening requirement of the '112 patent. Defendants' motion in this regard must therefore be denied.

## VI. *Jury Findings Under the Doctrine of Equivalents*

The jury found that two accused frame components infringed certain claims of the suit patents pursuant to the doctrine of equivalents. Defendants assert that the evidence of equivalency presented at trial was insufficient, that plaintiffs failed to establish the validity of the claimed equivalents over prior art, and that the jury should not have been permitted to consider infringement under the doctrine of equivalents without a preliminary finding by the Court that equitable considerations warranted the doctrine's application.

■■■ Defendants' contention that a party seeking to rely upon the doctrine of equivalents must first establish inequitable conduct by the alleged infringer was recently rejected by the Federal Circuit. *Hilton Davis Chemical Co. v. Warner–Jenkinson Co., Inc.,* 62 F.3d 1512 (Fed.Cir.1995). The Court in *Hilton Davis* further held that equivalency is a question of fact properly resolved by a jury, and that a trial court has no discretion with respect to application of the doctrine, but must instruct the jury on equivalents upon a patentee's proper demand. 62 F.3d at 1522.

■■■ A finding of infringement under the doctrine of equivalents may be premised upon evidence that the claimed and accused products perform substantially the same function or accomplish the same result in the same way. The applicability of the doctrine, however, is determined not by whether the function-way-result test has been satisfied, but rather by considering the "substantiality of the differences between the claimed and accused products." 62 F.3d at 1518.

■■■ The jury relied upon proof of equivalence to find that two accused products, Turaflex Models 841 and 878, infringed four claim elements. First, the jury found that Turaflex Model 841 infringed the 4% elastici-

ty requirement of claim 1 of the '112 patent based on evidence indicating that the frame exhibited 3.75% elasticity. Second, the jury concluded that Model 841 possessed the 30,-000 psi yield strength required in claim 5 of both the '112 and '955 patents based upon proof that Model 841 possessed a yield strength of 28,000 psi at −20°C and the required yield strength at higher temperatures. Third, with respect to the requirement in claim 5 that a component be subjected to a heat-treatment for at least one hour at a temperature not exceeding 400°C, the jury relied upon evidence that Model 841 was subjected to a heat treatment at 450°C for forty minutes, and that Model 878 was subjected to a heat treatment at 430°C for more than one hour. Finally, the jury concluded that Model 878 infringed claim 5 of both suit patents based upon proof of 2.8%, rather than the required 3%, heat-recoverable shape-memory.

The jury's findings of infringement pursuant to the doctrine of equivalents are amply supported by the trial record. First, each finding concerns a claim limitation expressed in numerical terms and subject to objective testing or empirical proof. The jury might well have concluded that the discrepancies between the claimed and accused products were insignificant based upon the apparently minor differences between the requirements of the patent claims and the measured characteristics of the accused components.

Moreover, plaintiffs provided the jury with expert testimony which buttressed this logical inference of substantial similarity. For example, Beshers opined during cross-examination that a yield strength measurement of 28,000 psi essentially meets a requirement of 30,000 psi, particularly given the difficulty of measuring yield strength precisely. Tr. 1149–50. (In addition, as discussed in Point IV above, claim 5, properly construed, does not require a yield strength of 30,000 psi at temperatures as low as −20°C.)

As another example, the jury had a clear factual basis for concluding that the differences between the elasticity and heat recoverable shape memory required by the suit patents and that exhibited by Models 841 and 878 were not significant. Plaintiffs introduced a chart depicting the appearance of an eyeglass frame temple subjected to various strains. *See* PX 23. This chart illustrates that an eyeglass frame temple strained by 3.5% will be bent at an angle of approximately 180°, and that a temple strained by 5.25% will be bent at an angle of approximately 225°. Based upon this chart, a jury could readily conclude that a difference in strain of 1.75% (the difference between 5.25% and 3.5%) results in a difference in angle of 45° (the difference between 225° and 180°). By simple arithmetic, then, a difference in strain of .25%—the difference between the 3.75% elasticity demonstrated by Model 841 at −20°C and the 4% elasticity required by claim 1 of the '112 patent—results in a difference in angle of less than 7°. Similarly, the .2% difference between the 2.8% heat-recoverable shape-memory exhibited by Model 878 and the 3% heat-recoverable shape-memory required by claim 5 of the suit patents would result in an even smaller difference in angle. Clearly, with recovery from strains resulting in bends of approximately 180° contemplated by the patent, a difference in angle of less than 7° might reasonably be considered by a jury to be insubstantial.

In addition, plaintiffs introduced two charts which summarized the evidence demonstrating that each of the accused frame components infringed each element of the claims of the suit patents. PX 438 and 439. Plaintiffs' reliance upon equivalent rather than literal proof of infringement is expressly noted at every relevant point on these charts. Beshers testified that each entry on these charts was accurate, and that the assertions of equivalence on the chart were fully justified. Tr. 1055–56. The jury had ample opportunity to evaluate Beshers' credentials and credibility, and might reasonably have given considerable weight to his testimony that the accused Turaflex frames behaved essentially as described in the claims of the suit patents.

Finally, the behavior of Models 841 and 878 at various temperatures was demonstrated for the jury by John Krumme, one of the inventors. Tr. 518–20, 524–26. During these demonstrations, the frames exhibited remarkable flexibility, elasticity and resistance

to permanent deformation, which are the essential characteristics of the claimed invention.

The only claim term which the jury found was infringed under the doctrine of equivalents which is not discussed in detail above is the requirement in claim 5 that a frame component be subjected to a heat treatment at a temperature not exceeding 400° for not less than one hour. Obviously, this claim term involves a processing step rather than a characteristic of a finished product. Accordingly, it was not possible for plaintiffs to establish equivalency with test results or demonstrations. The jury's finding of infringement under the doctrine of equivalents, however, was amply supported by the similarity in the temperature and duration of the heat treatments to which Models 841 and 878 were subjected, Beshers' expert opinion that the heat treatments were equivalent, and the evidence establishing that these models exhibited the characteristics and behaviors described in the other terms of the patent claims.

■■■ In their final argument concerning the doctrine of equivalents, defendants argue that plaintiffs failed to prove that the claims of the suit patents, as broadened by application of the doctrine of equivalents, are valid over the prior art. The findings of equivalence, however, were based upon proof of behavior so similar to that described in the patent claims that it is difficult to imagine how the prior art could read upon the marginally broadened claims without rendering the claims of the suit patents themselves invalid. (The jury, of course, rejected defendants' claim that the patents in suit were invalid because rendered obvious by the prior art.)

Moreover, the primary characteristic of the claimed invention, and the thrust of the debate over prior art before the PTO and at trial, concerned the elasticity described by the patent claims. *See, e.g.,* PX 4, defendant Tura's Request for Reexamination, at 4 (asserting that the prior art "anticipates the 'greater than 3% elasticity' set forth in the patent"); tr. 2002–49 (emphasizing, through the testimony of defendants' witness Natoshi Takezaki, that discussions between Takezaki

and the inventors focused upon the extent to which alloys with highly elastic properties were known in the prior art). As noted above, Beshers' tests indicated that Model 841 exhibited 3.75% elasticity rather than the 4% required by claim 1 of the '112 patent. Claim 1 of the '955 patent, however, requires only 3% elasticity, and was found to be valid over the prior art by the patent office and by the jury.

For these reasons, there was ample evidence to support the jury's finding of infringement under the doctrine of equivalents, and this finding did not broaden the claims of the suit patents to the extent where they read upon the prior art. Accordingly, this aspect of defendant's motion for judgment as a matter of law is denied.

## VII. *Presumptive Proof of Heat Treatment*

As discussed above, claim 5 of the '112 and '955 patents requires a heat treatment "at a temperature not exceeding 400°C for not less than one hour." Section 295 of Title 35 provides that, upon a showing that there is a substantial likelihood that an accused product was made by a patented process, and that plaintiff has made a reasonable effort to determine the process actually used but has been unable to do so, the accused product shall be presumed to have been made by the patented process. 35 U.S.C. § 295. With respect to certain frame components, the jury was instructed pursuant to Section 295 that they should presume, subject to proof to the contrary by the defendants, that the accused frames were subjected to the required heat treatment. Tr. 3274–75.

Defendants challenge the propriety of this instruction on several grounds. First, defendants argue that Section 295 applies only to pure process patent claims, and not to a hybrid patent in which the claimed invention is a product but the patent claims also include processing steps. Defendants further contend that plaintiffs failed to make the showings required by Section 295 concerning the likelihood that the allegedly infringing product was made by the patented process,

and the reasonableness of plaintiffs' efforts to determine the process actually used.

As defendants acknowledge, this issue was discussed at length during the charge conference held during the trial. Tr. 2949–50; 2972–73. No new arguments are raised by defendants in support of their motion for judgment as a matter of law. Accordingly, this aspect of defendants' motion is denied for the reasons stated during the charge conference, which are reflected in the cited portions of the trial record.

## VIII. *Nickel–Titanium Based Alloys*

Claims 1 and 5 of the suit patents describe eyeglass frames fabricated from a nickel-titanium based alloy. Defendants contend that, based upon the prosecution history, this claim term should be construed to require the use of an alloy comprised entirely of nickel and titanium. Because the accused Turaflex frames were fabricated from alloys primarily but not exclusively comprised of nickel and titanium, defendants assert that these frames cannot be found to infringe the suit patents.

Defendants failed to seek judgment as a matter of law in this ground during trial and are, therefore, procedurally barred from raising the issue now. Moreover, the merits of defendants' argument were addressed in detail and rejected by this Court prior to trial. *See* Memorandum and Order dated November 21, 1994 at 53–63. Defendants have raised no new arguments and have pointed to no additional evidence in support of their pending motion for judgment as a matter of law. Accordingly, for the reasons previously stated in this Court's Memorandum and Order of November 21, 1994, this aspect of defendants' motion is denied.

## IX. *Enablement*

■ Defendants asserted at trial that the claims of the '112 and '955 patents are invalid pursuant to 35 U.S.C. § 112 for lack of enablement. Section 112 requires that a patent specification contain

a written description of the claimed invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, to make and use the same.

The jury rejected defendants' contention that the specifications of the suit patents failed to meet the requirements of Section 112. Defendants now seek to set aside the jury's verdict as unsupported by the uncontradicted evidence at trial.

■ A patent is presumed to be valid, and a party challenging a patent's validity for failure to meet the enablement requirement of Section 112 bears the burden of establishing by clear and convincing evidence that the patent specification is not enabling. 35 U.S.C. § 282; *Morton Int'l, Inc. v. Cardinal Chem. Co.*, 5 F.3d 1464, 1469 (Fed.Cir.1993); *Ralston Purina Co. v. Far–Mar–Co., Inc.*, 772 F.2d 1570, 1574 (Fed.Cir.1985). The evidence presented at trial supports the jury's conclusion that defendants failed to meet their burden.

Defendants' proof that the patents in suit are not enabling consisted entirely of the testimony of Walter Johnson, their expert metallurgist. Johnson testified that, although he reviewed the specifications of the suit patents and attempted to follow them, he was unable to make the claimed invention.

Johnson's testimony was insufficient to satisfy defendants' burden of proof. First, Johnson's qualifications were unimpressive when compared to those of Dr. Beshers, and were, moreover, largely irrelevant to the question of enablement. Although he obtained a bachelor's degree in metallurgy, Johnson was never awarded any graduate degrees in metallurgy or material science, and has never published any books or articles. Tr. 2219, 2224. Johnson had no experience with shape memory alloys before he was retained by defendants to work on this case, nor did he have any experience with or knowledge about manufacturing eyeglass frames. Tr. 2224–25. Section 112 requires that a patent specification explain how to make the claimed invention in terms which are understandable to one of ordinary skill in the art. Clearly, Johnson is not one of ordinary skill in the art of manufacturing eyeglass frames. For this reason alone, Johnson's inability to make the claimed invention

is not clear and convincing proof that the specifications of the suit patents are not enabling.

Moreover, the evidence at trial demonstrated that Johnson's efforts to make the claimed invention were limited and flawed. First, Johnson did not begin his attempts to make the claimed invention until three weeks prior to trial. Defendants presented no evidence regarding the amount of time during that three-week period which Johnson devoted to attempting to fabricate a frame in accordance with the patent specifications. Tr. 2316–17. In addition, although Johnson acknowledged that the specifications describe several ways of making the claimed invention, he was forced to concede that he tried to make the patented frames in only one of the ways described, and that the particular example he attempted to follow was selected by counsel for the defendants. Tr. 2314–15. Johnson further acknowledged that the specifications of the suit patents, when discussing the selection of an appropriate alloy from which to fabricate the claimed invention, refer back to another patent, but that he neglected to consult the patent so referenced. Finally, Johnson conceded that, although the specifications indicate that the material being used should be pressed to attain the proper shape, he did not have the equipment required for pressing, and so instead rolled the alloy through dyes to give it the right shape. While he insisted that pressing and rolling are similar processing steps, Johnson conceded that they are not identical. Tr. 2318–20.

 In light of these deficiencies in Johnson's testimony, it was entirely proper for the jury to conclude that defendants failed to meet their burden of establishing lack of enablement by clear and convincing evidence. Defendants nevertheless assert that plaintiffs were required, in response to Johnson's testimony, to introduce independent evidence that the patent specifications are sufficiently enabling to meet the requirements of Section 112. *See Def.Mem.* at 85–86. As noted above, however, a defendant bears the burden of establishing the invalidity of a patent, and a plaintiff seeking to enforce the patent is therefore obliged to rebut the defendant's proof only once the defendant has met its burden. The defendants in this case have failed to meet their burden of proof, and plaintiffs, as a result, were not required to submit any evidence in rebuttal.

Finally, defendants point to several cases in which courts have held that enablement is a matter of law, and should be decided by the court. *See In re Wright,* 999 F.2d 1557, 1561 (Fed.Cir.1993); *In re Ziegler,* 992 F.2d 1197, 1200 (Fed.Cir.1993). Defendants assert that this Court should therefore independently determine whether the patent specifications meet the enablement requirement of Section 112. Although the issue of enablement may be one of law, it is dependent on several factual questions which were appropriately submitted to the jury. *See In re Wright,* 999 F.2d at 1561 (stating that "[a]s a statutory requirement, enablement is a question of law that we review de novo; however we review for clear error any underlying facts found . . . in rendering [the] enablement determination."); *Quaker City Gear Works, Inc. v. Skil Corp.,* 747 F.2d 1446, 1453–54 (Fed.Cir.1984) (recognizing that, while the issue of enablement is a matter of law, it may involve resolution of subsidiary questions of fact); *Newell Companies, Inc. v. Kenney Manufacturing Co.,* 864 F.2d 757, 765 (Fed.Cir.1988) (stating that where the case turns on factual issues, the question of obviousness, also a matter of law, may be given to the jury with proper instructions), *cert. denied,* 493 U.S. 814, 110 S.Ct. 62, 107 L.Ed.2d 30 (1989).

Whether the question of enablement is reviewed de novo as a matter of law or evaluated for sufficiency of the evidence as a jury question, the same conclusion is reached. Johnson's testimony, for the reasons discussed above, is simply inadequate to demonstrate by clear and convincing evidence that the patents fail to meet the enablement requirement of Section 112. Accordingly, defendants' motion for judgment as a matter of law on the issue of enablement is denied.

## X. *Inducing Infringement*

The jury found defendants Arthur Brody and Brodart Co. liable for inducing the direct

infringement of defendant Tura.[20] As 35 U.S.C. § 271(b) provides, a party who actively induces infringement of a patent is liable as an infringer. Defendants assert that the jury was improperly charged with respect to the level of intent necessary for inducement.

The jury was instructed that, to hold Brody and Brodart liable for inducing infringement, they first had to find that Tura directly infringed the suit patents, and next that Brody and Brodart "actively and knowingly" aided and abetted Tura's direct infringement. The jury was further charged that a verdict of inducement required a finding that the defendants specifically intended to encourage Tura's infringement, and not merely that they knew of it. This requirement was explained as imposing upon plaintiffs the burden to establish that Brody or Brodart knew or should have known that their conduct would induce Tura to commit the acts which the jury found to constitute direct infringement. Tr. 3276–77.

Defendants' challenge to the jury charge is primarily directed to a subsequent portion of the instruction, in which the jury was told that knowledge of an infringement controversy is sufficient to support a finding of knowing inducement to infringe. Defendants further assert that it was improper to tell the jury that they could consider whether Brodart or Brody had a good faith basis for believing that Tura's conduct was in fact not infringing, and that good faith reliance on advice of counsel could be considered in making this determination. Tr. 3277. Defendants contend that knowledge of an infringement controversy is insufficient to support a verdict of inducement, and that good faith reliance on advice of counsel is not merely a consideration, but instead compels a finding that inducement did not occur.

The jury charge on inducement in this case is fully supported by the holding and rationale in *Symbol Technologies v. Metrologic Instruments, Inc.*, 771 F.Supp. 1390 (D.N.J. 1991) The Court in *Symbol Technologies* held that knowledge of an infringement controversy is sufficient to support a finding of

inducement, and that advice of counsel is irrelevant because specific intent to infringe is not necessary. 771 F.Supp. at 1404–05.

Although the precedent concerning the required intent for inducement is not entirely clear and consistent, the holding in *Symbol Technologies* finds ample support in recent decisions of the Federal Circuit. The Federal Circuit's decision in *Hewlett–Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464 (Fed. Cir.1990), has been frequently relied upon by courts attempting to analyze whether the intent necessary for a finding of inducement to infringe has been shown. The Court in *Hewlett–Packard* carefully articulated the required intent as follows:

> [W]e are of the opinion that proof of actual intent *to cause the acts which constitute the infringement* is a necessary prerequisite to finding active inducement.

909 F.2d at 1469 (emphasis added). As the cited language plainly indicates, the Court in *Hewlett–Packard* focused on the defendant's intent to induce the acts found to be infringing, and not on the defendant's intent to infringe the patent. *See also Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1579 (Fed.Cir.1986) (noting that liability under Section 271(b) does not require conduct rising to the level of willful infringement); *Curtis Mfg. Co. v. Plasti–Clip Corp.*, 888 F.Supp. 1212, 1222–25 (D.N.H.1994); *Maxwell v. K Mart*, 880 F.Supp. 682, 685 (D.Minn.1995). *Cf. Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553 (Fed.Cir.1990) (holding that a plaintiff seeking to establish inducement to infringe must show that the alleged infringer's actions induced infringing acts and that "he knew or should have known his actions would induce actual infringements"); *Dynamis, Inc. v. Leepoxy Plastics, Inc.*, 831 F.Supp. 651, 656–57 (N.D.Ind.1993) (relying on the cited portion of *Hewlett–Packard* and holding that inducement to infringe requires "actual knowledge of the patent and the infringement").

The holding in *Symbol Technologies* flows logically from the case law and legislative decision.

**20.** Defendant Brody's motion to dismiss for lack of venue is discussed below in Point XII of this

history leading up to the passage in 1952 of 35 U.S.C. § 271, which are discussed by the Court in *Hewlett–Packard.* Prior to the Patent Act of 1952, liability for infringement was analyzed by courts "under a theory of joint tortfeasance," and a party who caused or aided and abetted the commission of another's infringing acts was held jointly liable with the primary infringer or tort-feasor. *Hewlett–Packard,* 909 F.2d at 1469. The legislative history leading up to the enactment of Section 271 indicates that the statute was not intended to change the state of the substantive law, but merely to codify it. *Id.* Thus, it remains appropriate to consider inducement to infringe as a form of joint tortfeasance.

The level of intent required before liability may be imposed upon a primary tortfeasor applies as well to one who aids and abets or causes another to commit a tort. *See, e.g.,* Restatement (Second) of Torts, § 876, especially at Comments a and e. As the Federal Circuit has recently reiterated, intent is not an element of infringement, and only becomes relevant "when a patent owner seeks enhanced damages or attorney fees." *Hilton Davis,* 62 F.3d at 1519, 1523.

 For the reasons stated above, I conclude that inducement does not require intent to cause another to infringe a patent, but focuses instead upon the intent to cause another to commit acts which constitute patent infringement. Accordingly, it was proper to instruct the jury that knowledge of an infringement controversy is sufficient to establish liability, and that an assertion of good faith reliance on advice of counsel may be considered, but is not necessarily dispositive.

## XI. *Damages*

Defendants raise three distinct challenges to the amount of damages awarded to plaintiffs by the jury. Each is discussed below.

### A. Proof Regarding Marchon Frames

 At defendants' request, the jury was instructed that plaintiff Marchon, to recover damages for lost profits, "must demonstrate that its frames are covered by the suit patent claims." Tr. 3280. The jury verdict included

an award to Marchon of lost profits in the amount of $12,585,093.

 Defendants contend that Marchon is not entitled to damages for lost profits because the evidence at trial was insufficient to establish that Marchon's own frames are covered by the suit patents. Defendants assert in this regard that Marchon failed to prove that its eyeglass frames meet several elements of claims 1 and 5 of the suit patents. As defendants acknowledge, however, there is no requirement that a plaintiff's product meet more than one of the claims of the patents in suit before the plaintiff may recover damages for infringement. Accordingly, defendants assertions with respect to claim 5 need not be addressed, provided the evidence at trial was sufficient to allow the jury to conclude, as it did, that Marchon's frames are covered by claim 1 of the '112 and '955 patents.

Defendants contend that the proof at trial was insufficient to establish that Marchon's frames meet the terms of claim 1 in two respects. First, defendants assert that Marchon failed to establish that its frames are in the "work-hardened pseudoelastic state" as required by claim 1 of the '955 patent. This contention, however, is based upon the same claim construction advanced by defendants but rejected in Point V above, and therefore need not be given further consideration.

Defendants next assert that Marchon failed to establish that its frames were subjected to 30% work-hardening, as required by claim 1 of the '112 patent. In their two written motions for a directed verdict submitted during trial, however, defendants sought a directed verdict that none of the Marchon frames are covered by claim 5 of the suit patents, but did not seek a similar ruling with respect to claim 1. Had they done so, Marchon would have had the opportunity to address any alleged deficiency in its proof.

Moreover, during his testimony at trial, Dr. Beshers, plaintiffs' expert, testified that he tested all of the Marchon frames in issue, and that all were covered by claim 1 of the '955 and '112 patents. Tr. 1056. Defendants correctly point out that plaintiffs did

not introduce at trial any underlying documentation to support Dr. Beshers' conclusion that Marchon's frames had been subjected to 30% work-hardening. The jury, however, was entitled to rely on Beshers' conclusion without such documentation. In addition, Beshers explained that he calculated the percentage of work-hardening to which the defendants' frames had been subjected by examining the shape of the frame components in issue, and that the results he reached were minimum estimates. Tr. 964, 968, 978, 1042–43. The jury might well have compared the shape of the Marchon frames to the shape of defendants' frames and, particularly with no contradictory evidence presented by defendants to consider, concluded that the shapes of the frames were sufficiently similar to warrant an inference of comparable amounts of work-hardening.

■ Finally, in a decision rendered after the jury returned its verdict, the Federal Circuit has squarely held that a plaintiff in a patent suit is entitled to recover for all profits he would have made but for the defendant's infringement, including profits on sales of goods not covered by the suit patent. *Rite–Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1546–49 (Fed.Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 184, 133 L.Ed.2d 122 (1995). A consumer of eyeglass frames has no interest in the degree to which the frames were work-hardened during fabrication. Therefore, assuming that Marchon's frames meet all the elements of claim 1 of the '112 patent but for the required percentage of work-hardening, the frames would clearly be an acceptable non-infringing substitute, but one available only from Marchon. Accordingly, Marchon would be entitled to damages for lost profits even if it were unable to establish that its frames were subjected to the percentage of work-hardening which claim 1 of the '112 patent requires. *See Rite–Hite*, 56 F.3d at 1548.

### B. Standing of Marcolin and Rothandberg

■ Defendants next argue that plaintiffs Marcolin and Rothandberg lack standing as plaintiffs in this action. Defendants contend that the jury's damage award, to the extent that it includes compensation for profits lost by these two entities, should therefore be set aside.

Defendants moved to dismiss the claims asserted by Marcolin and Rothandberg prior to trial. Magistrate Judge Carter, to whom the motion had been referred, heard lengthy oral argument on December 17, 1992. During a status conference on April 19, 1993, Magistrate Judge Carter advised the parties that he would recommend that defendants' motion be denied for the reasons stated during the oral argument. Defendants did not file objections to Magistrate Judge Carter's recommendation. *See* Fed.R.Civ.P. 72(b). By Order dated September 14, 1993, United States District Judge Sterling Johnson, Jr., to whom this case was then assigned, adopted Magistrate Judge Carter's recommendation. No motion for reargument or reconsideration was filed. Only now, after the jury has awarded damages based upon profits lost by Rothandberg and Marcolin, do defendants seek to have the Court revisit this issue and rule that these entities lack standing to assert any rights pursuant to the suit patents.

■ In *Virgin Atlantic Airways v. National Mediation Board*, 956 F.2d 1245 (2d Cir.), *cert. denied*, 506 U.S. 820, 113 S.Ct. 67, 121 L.Ed.2d 34 (1992), the Court, reviewing the scope of the law of the case doctrine, noted that

> where litigants have once battled for the court's decision, they should neither be required, not without good reason permitted, to battle for it again.

956 F.2d at 1255 (quoting *Zdanok v. Glidden Co.*, 327 F.2d 944, 953 (2d Cir.), *cert. denied*, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964)). Reconsideration of a prior court order is generally granted only upon a showing that the applicable law has changed, that pertinent new evidence has been developed, or that the prior order was clearly erroneous or manifestly unjust. *Id.*

Defendants do not point to any new evidence or a change in the law warranting reconsideration. Instead, they simply restate the same arguments which were rejected by Magistrate Judge Carter and District

Judge Johnson, presumably in an effort to demonstrate that Judges Carter and Johnson made decisions which were clearly erroneous.

Defendants first assert in this regard that Magistrate Judge Carter never made any findings or reached any conclusions before denying their motion to dismiss. *See* Mem. of Law in Support of Def.Mot. to Dismiss, dated Jan. 23, 1995, at 10. This is simply inaccurate. During the oral argument held on December 17, 1992, Judge Carter clearly articulated the factual basis for his decision. *See* Tr. of Oral Arg. at 12–14. Moreover, the reasoning underlying Judge Carter's decision is apparent from a reading of the entire oral argument transcript. Tr. 2–43.

In further support of their argument that the prior rulings of Magistrate Judge Carter and Judge Johnson were clearly erroneous, defendants rely on *Site Microsurgical Sys., Inc. v. Cooper Companies, Inc.,* 797 F.Supp. 333 (D.Del.1992). The Court in *Site Microsurgical Systems* denied standing to a parent company of a patent owner based upon the general principle that patent rights may be enforced only by a patentee or exclusive licensee. In doing so, however, the Court noted that the parent company had no involvement in the marketing of the patented technology, and that its only connection to the patent rights in issue was through corporate ownership. 797 F.Supp. at 338.

The facts in this case are readily distinguishable from those involved in *Site Microsurgical Systems.* Unlike the parent company in *Site,* Rothandberg and Marcolin were actively involved in marketing the eyeglass frames in issue under Marchon's direction and control. *See* Tr. of Oral Arg. at 10–15. In *Kalman v. Berlyn Corp.,* 914 F.2d 1473 (Fed.Cir.1990), the Court held that a party which was neither a patentee nor an exclusive licensee had standing. In reaching this decision, the Court emphasized the "Congressional mandate that, in patent actions, ... the court shall award the claimant damages adequate to compensate for the infringement," and relied upon the close nexus between the patentee and the licensee with respect to the marketing of the patented

item. *Kalman,* 914 F.2d at 1482. Particularly in light of *Kalman,* the decisions rendered by Magistrate Judge Carter and District Judge Johnson were not clearly erroneous. Accordingly, there is no reason to allow defendants to relitigate the question of standing, and this aspect of defendants' motion is denied.

### C. Attorney's Fees

The jury awarded $1.5 million to Marchon in attorney's fees, and awarded $2.5 million to CVI/Beta, representing royalties withheld by Marchon to compensate Marchon for legal fees incurred in connection with this litigation. As plaintiffs acknowledge, these attorney's fee awards must be set aside.

### XII. *Defendant Brody's Motion to Dismiss for Lack of Venue*

■ Defendant Arthur Brody asserts that the claims against him should be dismissed because venue is not properly asserted over him in the Eastern District of New York. The sole and exclusive bases for venue in a patent infringement action are set forth in 28 U.S.C. § 1400(b), which states that

[a]ny civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business.

*See Fourco Glass Co. v. Transmirra Products Corp.,* 353 U.S. 222, 228, 77 S.Ct. 787, 792, 1 L.Ed.2d 786 (1957).

Under the first prong of Section 1400(b), venue properly lies where the defendant resides. Brody is a resident of California and does not maintain a residence in New York. *Brody Aff.,* ¶ 2.[21] Accordingly, plaintiffs must rely on the second basis for venue set forth in Section 1400(b) to demonstrate that venue as to Brody is proper in this district.

■ The second basis for venue requires a showing that a defendant has committed acts of infringement in the district, and that

---

**21.** "Brody Aff." refers to the affidavit of Arthur Brody dated June 2, 1992 and submitted in support of the defendants' motion to dismiss all claims against Brody for lack of venue.

he maintains a regular and established place of business there. Plaintiff bears the burden of establishing both elements before venue can be found to be proper. *See Ipco Hosp. Supply Corp. v. Les Fils D'Auguste Maillefer S.A.*, 446 F.Supp. 206, 207–08 (S.D.N.Y. 1978). Plaintiffs assert that Brody committed acts of infringement in this District by inducing defendant Tura to infringe the suit patents. In particular, plaintiffs contend that the evidence developed during discovery and at trial establishes that Brody: (1) participated in discussions and attended directors meetings at Tura's facilities in the Eastern District of New York where Tura's strategy concerning the sale of Turaflex frames was discussed; (2) retained and met with counsel in New York to obtain advice about the Beta patents; and (3) used a New York apartment rented by Tura while he was "involved in the decisions concerning the infringing Turaflex frames." *Letter from plaintiffs' counsel, Edgar Haug, to the Court dated Jan. 16, 1995*, at 3.

The testimony relied on by plaintiffs, however, while indicating that Brody was present in this district on certain occasions, fails to establish any connection between his presence here and any infringing acts he may have committed or induced. For example, plaintiffs rely on the deposition testimony of Christopher Daly, excerpts of which were received into evidence during the trial. Plaintiffs assert that Daly's testimony establishes that Brody attended directors meetings in this district at which Tura's strategy for selling Turaflex frames was discussed. Daly, however, testified only that Tura Holdings, Inc. has annual directors meetings at the Tura facility in New York, and that Brody was present at some of these meetings. When questioned about the subject matter discussed at the meetings, Daly testified as follows:

Q: So you went through all the minutes from 1987 to date and didn't find anything in those minutes which in any way related to this litigation or the Beta patents; is that correct?

A: The only item that would have been relevant would have been the ratification of the management agreement. That's the only one I could recall.

Q: Do you recall this lawsuit ever being discussed at a directors' meeting of Tura Holdings?

A: Not specifically a directors' meeting, no.

Tr. 1231:4–12. Clearly, this testimony does not establish, as plaintiffs contend, that Brody attended any meeting in the Eastern District at which strategies for selling Turaflex frames were discussed, or that Brody engaged in any other conduct while attending directors meetings which constituted inducement to infringe.

Plaintiffs next assert that Brody used an apartment in this district provided by Tura while involved in making decisions about the infringing frames. Daly's testimony concerning the Tura apartment, however, consisted only of the following:

Q: What is the nature of th[e] compensation [received by Brodart for providing management services to Tura]?

A: It gets paid $15,000 a week for providing senior management services and as part of the agreement Tura provides an apartment for Brodart employees to live in when they come down to New York since Brodart does not have a New York location.

Q: Have you ever spent an evening in that apartment?

A: Yes, I have.

Q: Do you know if Mr. Brody has?

A: Yes, he has.

Tr. 1237:16–25. This testimony establishes only that Brody used a Tura apartment which is located in this district, a fact with no bearing on venue absent evidence demonstrating a connection between Brody's stays at the apartment and specific conduct on his part.

Plaintiffs were unable to develop any connection between Brody's stays at the Tura apartment and infringing acts when they deposed Brody during discovery. Although Brody did not testify at trial, he was questioned at his deposition about whether he had ever stayed at the Tura apartment. Brody acknowledged that he had stayed at the

apartment on three occasions. *Brody Dep.* at 18–19, 402. When asked about his activities in New York after a night he may have stayed at the Tura apartment, however, Brody responded that he could not recall the purpose of his trip. *Brody Dep.* at 403. Because plaintiffs have adduced no evidence linking Brody's stays at the Tura apartment to any business discussion or activity, Brody's use of the apartment is insufficient to provide a basis for venue.

Perhaps the strongest evidence indicating that Brody committed acts of infringement in the Eastern District is Daly's testimony that Brody participated in two to six discussions regarding the Beta patents, and that a majority of these discussions took place at the Tura facility in this district. Daly, however, could recall only that Brody participated in these conferences either in person or by telephone. Tr. 1234–1235. When questioned about the subject matter of these discussions, Daly stated only that he was "brought up-to-date on the status of the case and the fact that there were some patents." Tr. 1233:25—1234:3. Daly was not asked whether any decisions regarding the Beta patents were made during these discussions, or whether Brody said or did anything during these discussions which may have induced Tura's infringement of the patents.

■■■ Inducement to infringe occurs when one actively and knowingly aids or abets another's infringement. *See Water Technologies Corp. v. Calco, Ltd.,* 850 F.2d 660, 668 (Fed.Cir.) *cert. denied,* 488 U.S. 968, 109 S.Ct. 498, 102 L.Ed.2d 534 (1988); *Symbol Technologies, Inc. v. Metrologic Instruments, Inc.,* 771 F.Supp. 1390, 1404 (D.N.J. 1991). While planning or directing infringing acts committed in a district may suffice to render venue there proper, *see Kierulff Assoc. v. Luria Bros. & Co., Inc.,* 240 F.Supp. 640 (S.D.N.Y.1965), Brody's mere participation in discussions about the status of this case or the existence of the Beta patents does not constitute active inducement to infringe. Without more specific evidence regarding the subject matter of the discussions in which Brody took part and Brody's contribution to those discussions, this Court cannot conclude that Brody aided or abetted Tura's

infringement of the Beta patents during the conversations described by Daly.

When considered in its totality, the evidence relied upon by plaintiffs simply does not support an inference that Brody's inducing conduct must have taken place while Brody was in the Eastern District of New York. As noted above, Daly testified merely that Brody was present either by telephone or in person in this district for a "majority" of the two to six discussions regarding the Beta patents in which he participated. Moreover, Brody does not make frequent business trips to New York. In his affidavit, Brody states that he spends no more than ten days per year in New York, including the time he devotes to performing activities for Tura and for all other business and social purposes. *Brody Aff.,* ¶ 4. Similarly, at his deposition, Brody testified that he devotes less than 100 hours per year to business on behalf of Tura and that he makes between six and seven business trips per year to New York. *Brody Dep.* at 14–15. Given how infrequently Brody travels to New York, there is no reason to infer that he must have, or even that he probably, committed acts of inducement while he was in this district.

For these reasons, plaintiffs have failed to establish that Brody committed any acts of infringement in this district. Accordingly, the question of whether Brody has a regular and established place of business in this district need not be reached.

■■■ As an alternative basis for venue, plaintiffs argue that Tura's residence and its infringing activities in the Eastern District of New York should be imputed to Brody because Brody's dominance of Tura renders him its alter ego. *See Pl.'s Mem. of Law in Opp'n Mot. to Dismiss* at 15–20; *Letter from Edgar Haug to the Court dated 12/16/94* at 7; *Letter from Edgar Haug to the Court dated 1/16/95* at n. 1. Under limited circumstances, it may be appropriate to pierce the corporate veil to establish venue in a patent action. *See Variable–Parameter Fixture Dev. Corp. v. Morpheus Lights Inc.,* 28 U.S.P.Q.2d 1239, 1993 WL 335027 (S.D.N.Y.1993) (*citing Minnesota Mining & Manufacturing Co. v. Eco Chem, Inc.,* 757 F.2d 1256, 1265 (Fed. Cir.1985)); *Kinetic Instruments, Inc. v.*

*Lares,* 802 F.Supp. 976, 987 (S.D.N.Y.1992). New York courts, however, "are reluctant to disregard the corporate entity." *William Wrigley Jr. Co. v. Waters,* 890 F.2d 594, 600 (2d Cir.1989). A court should pierce the corporate veil and find a corporation's principal to be its alter ego only upon a showing that the corporate form has been used to commit a fraud, or "when it can be demonstrated that ... the corporation has been so dominated by an individual ... and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own." *Id.* (*citing Gartner v. Snyder,* 607 F.2d 582, 586 (2d Cir.1979)). Plaintiffs point to no evidence which demonstrates either that Brody used the corporate form to perpetrate a fraud, or that Tura's corporate identity was disregarded and that it was primarily transacting Brody's business rather than its own.

Moreover, plaintiffs' reliance on *Variable–Parameter Fixture Dev. Corp.* and *Kinetic Instruments, Inc.* to support their assertion that Brody's dominance of Tura makes it his alter-ego is misplaced. In both cases, the courts held that "piercing the corporate veil" may be warranted as a matter of equity because the corporation in issue was controlled by an individual defendant who siphoned corporate funds to prevent plaintiffs from collecting any judgment they obtained against the corporation. *See Variable–Parameter,* 28 U.S.P.Q.2d at 1240 (concluding that plaintiff established a prima facie case of alter ego by alleging that the corporate defendant's sole shareholder withdrew corporate funds which would have been available to satisfy a judgment after the litigation commenced); *Kinetic Instruments,* 802 F.Supp. at 986 (concluding that plaintiff established a prima facie case of alter ego by alleging that the dominant shareholder in the corporation advised plaintiff that he had taken steps to render the corporation unable to pay a judgment, and that piercing the corporate veil was therefore warranted to prevent fraud and injustice).

Plaintiffs here have failed to set forth any basis for piercing Tura's corporate veil. There has been no evidence that Brody has engaged in fraud, intermingled corporate and personal funds, undercapitalized the corporation, failed to maintain separate books and records or otherwise ignored corporate formalities, failed to pay dividends or permitted the corporation to engage in transactions while insolvent. *See, William Wrigley Jr. Co. v. Waters,* 890 F.2d at 600–01. Accordingly, Tura's residence and activities may not be imputed to Brody for the purposes of determining whether venue as to Brody is proper in this district.

 Finally, plaintiffs argue that concerns for fairness and judicial economy warrant a finding that venue as to Brody is proper in this district. Although dismissal of this action against Brody may not be an efficient result, the Supreme Court has specifically held that Section 1400(b) must be strictly followed and not given a liberal construction guided by policy considerations. *See Schnell v. Eckrich & Sons,* 365 U.S. 260, 262–64, 81 S.Ct. 557, 5 L.Ed.2d 546 (1961). If the requirements for venue under Section 1400(b) are not met, the Court is constrained to dismiss the action, even where the result is inefficient or unfair. *See Tolliver v. Edison,* No. G88–51CA1, 1988 U.S.Dist. LEXIS 17811 (W.D.Mich., June 24, 1988) (*citing Schnell*); *Toombs v. Goss,* 768 F.Supp. 62, 65 (W.D.N.Y.1991) (stating that "[a] district court cannot dispense with the explicit patent venue requirement[s, even] in cases involving multiple defendants or conspiring defendants.").

Because plaintiffs have failed to demonstrate facts which would support venue under Section 1400(b), Brody's motion to dismiss for lack of venue is granted.

### XIII. *Defendants' Antitrust Counterclaims*

 Defendants object to the entry of a final judgment in this action, asserting that they have brought counterclaims which remain unadjudicated. Defendants make this argument in a memorandum of law dated January 23, 1995, submitted to assert objections to a proposed form of final judgment which had previously been submitted to the Court by plaintiffs, and in a letter to the Court from David L. Harris, Esq., dated February 6, 1995.

The antitrust counterclaims which defendants assert are still pending were first raised in the form of proposed pleadings on the eve of trial. By motion dated November 18, 1994, defendant Tura sought leave to amend its amended counterclaims to assert new antitrust allegations. As defendants now acknowledge, the Court never formally granted this motion. *See* Defendants' Memorandum of Law dated January 23, 1995 at p. 5, n. 1. Rather, defendants assert that Tura's motion to amend its amended counterclaims was implicitly granted by the Court in its Memorandum and Order dated November 21, 1994. It is clear, however, from the Memorandum and Order as well as the conferences with counsel shortly before and after it was issued that defendants' motion was granted only to the extent of allowing Tura to assert a claim pursuant to *Walker Process Equip., Inc. v. Food Mach. and Chem. Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), and that such a claim does not survive the jury's findings that the suit patents are valid and were infringed. *See* Memorandum and Order at 74–76.

Moreover, defendants' representations to the Court at and about the time they moved to amend their amended counterclaims clearly indicate that defendants were not seeking leave to assert any claims which did not depend upon a finding that the patents in suit were either invalid or not infringed. During oral argument on the motions which are addressed in the Memorandum and Order, held just slightly more than one month prior to trial, the Court asked the parties to consider bifurcating the trial of the plaintiffs' patent claims from that of defendants' antitrust counterclaims. In suggesting that bifurcation could potentially save judicial resources, the Court stated that

> clearly, if there's a finding of validity and infringement in the patent case your antitrust claims go down. You can't have an antitrust case ... if the jury finds for the plaintiffs on validity and infringement.

Tr. of Oct. 12, 1994 at 174. Defendant's counsel, Mr. Harris, responded, "I think that's right." *Id.* It is noteworthy in this regard that the parties and the Court were required to rely upon defendants' oral description of their claims, because defendants were withdrawing claims and altering their theories in the course of oral arguments made during the month prior to trial. *Id.* at 132.

The Court discussed the question of bifurcation with counsel again during a conference held on November 29, 1994, less than two weeks after the Memorandum and Order on which defendants rely was issued. In the course of debating the merits of bifurcation, defendants' counsel asserted that "I am not so sure I have an antitrust claim if this patent is found valid and infringed," to which the Court responded, "[r]ight." Tr. of Nov. 29, 1994 at 18. This exchange was the last discussion of defendant Tura's motion to amend its amended counterclaims before the jury returned its verdict.

As these representations by defendants' counsel make clear, it was understood by all parties and the Court that the only counterclaims which defendants were permitted to assert on the eve of trial depended upon findings of invalidity or non-infringement of the suit patents. The Court, in fact, relied upon defendants' representations in this regard in resolving the bifurcation issues raised during the oral argument on October 12, 1994. Only now, having the benefit of hindsight and in response to a jury verdict concluding that the suit patents are valid and were infringed, do defendants raise their "pending" antitrust counterclaims as an obstacle to the entry of final judgment.

For the reasons stated above, the Court concludes that there are no properly asserted counterclaims which remain unadjudicated. Accordingly, it is appropriate to enter final judgement on all claims asserted by the parties.

### XIV. *Terms of the Final Judgment*

Plaintiffs' counsel has submitted a proposed form of final judgment. Defendants, by memorandum dated January 23, 1995 and letter dated February 6, 1995, have challenged the propriety of several aspects of the proposed judgment.

The proposed judgment submitted by plaintiffs includes several paragraphs de-

claring that defendants have failed to establish the invalidity of the patents in suit. Defendants properly point out that these proposed paragraphs do not afford relief, and that the issues with which they are concerned are adequately addressed by a provision dismissing all affirmative defenses with prejudice. Accordingly, these provisions proposed by plaintiffs will not be included in the Court's final order.

■ Plaintiffs propose several provisions enjoining defendants from making, using or selling eyeglass frames with the characteristics described in the claims of the suit patents. In essence, plaintiffs propose a general injunction prohibiting further infringement of their patent rights. Such sweeping relief has been held to be unreasonably overbroad. *See KSM Fastening Sys., Inc. v. H.A. Jones Co., Inc.*, 776 F.2d 1522, 1526 (Fed.Cir.1985); *see also, Hilton Davis Chem. Co.*, 62 F.3d at 1582 n. 39; *Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 986 F.2d 476, 479–80 (Fed.Cir.1993). Rather, injunctive relief should be limited to the particular devices found to infringe and any

> alteration in the device [which] is "merely colorable" and obviously was made for the purpose of evading the decree without essential change in the nature of the device.

*American Foundry & Mfg. Co. v. Josam Mfg. Co.*, 79 F.2d 116, 118 (8th Cir.1935) (*quoting Radio Corporation of America v. Cable Radio Tube Corporation*, 66 F.2d 778, 782 (2d Cir.1933)). Accordingly, the final judgment and order will prohibit defendants from making, using or selling the specific eyeglass frames found in this action to be infringing, or any frames which are similarly infringing because essentially identical to the specific models which were found by the jury to infringe.

■ Finally, the parties dispute the proper rate at which to compute prejudgment interest. Although a plaintiff prevailing in a patent action is generally entitled to an award of prejudgment interest, the rate and compounding of interest are matters of discretion for the Court. *See, General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 654–57, 103 S.Ct. 2058, 2062–63, 76 L.Ed.2d 211 (1983); *Rite–Hite*, 56 F.3d at 1555; *Uniroy-*

*al, Inc. v. Rudkin–Wiley Corp.*, 939 F.2d 1540, 1545 (Fed.Cir.1991); *Bio–Rad Lab. v. Nicolet Instrument Corp.*, 807 F.2d 964 (Fed. Cir.1986), *cert. denied*, 482 U.S. 915, 107 S.Ct. 3187, 96 L.Ed.2d 675 (1987); *Gyromat Corp. v. Champion Spark Plug Co.*, 735 F.2d 549, 556–57 (Fed.Cir.1984).

■ Damages in an infringement case should ensure that a plaintiff is fully compensated. *General Motors*, 461 U.S. at 654, 103 S.Ct. at 2062; *Rite–Hite*, 56 F.3d at 1555. Accordingly, courts have frequently awarded compounded prejudgment interest at or about the prime rate. *See, e.g., Stryker Corp. v. Intermedics Orthopedics, Inc.*, 891 F.Supp. 751, 833 (E.D.N.Y.1995); *Grain Processing Corp. v. American Maize–Products Co.*, 893 F.Supp. 1386, 1396 (N.D.Ind.1995).

■ At trial, plaintiffs presented uncontroverted expert testimony that it would be reasonable to expect that a company such as plaintiff CVI/Beta would be required to pay one per cent above the prime rate to borrow funds. Tr. 1780. The same expert concluded, based upon a review of financial information pertaining to plaintiff Marchon, that Marchon was paying at or about the prime rate to borrow funds during the defendants' infringement. Tr. 1775; Plaintiffs' Ex. 440.25. Accordingly, interest will be computed on the damages awarded to plaintiff CVI/Beta at one percent above the prime rate, compounded annually, and on the damages awarded to Marchon at the following rates, taken from plaintiffs' trial exhibit 440.25, compounded annually: for 1989, 11%; for 1990, 9.69%; for 1991, 8.75%; for 1992, 6.55%; for 1993, 6.06% and for 1994–1995, 6.20%.

## CONCLUSION

The Court will enter a final judgment and order consistent with this opinion.

### *JUDGMENT AND ORDER*

Judgment is entered on the jury's verdict in the Form of Special Verdict, rendered December 22, 1994 in this case, as follows:

1. U.S. Patents 4,772,112 and 4,896,955 are owned by Plaintiff CVI/Beta Ventures,

Inc. and Plaintiff, Marchon Eyewear, Inc. is an exclusive licensee under those patents. Marchon Eyewear, Inc. exploits its exclusive license rights through its affiliated and controlled companies, Plaintiffs, Marcolin USA, Inc. and Rothandberg, Inc.

2. The claims of U.S. Patent No. 4,772,112 have not been proven invalid or unenforceable.

3. The claims of U.S. Patent No. 4,896,955 have not been proven invalid or unenforceable.

4. Defendant Tura L.P. has infringed the following claims of U.S. Patent 4,772,112 by sale of the following models of Turaflex eyeglass frames:

| Turaflex Model | Claims Infringed [1] |
| --- | --- |
| 841 | 1, 2, 5*, 6 |
| 868 | 1, 3 |
| 869 | 1, 2, 5, 6 |
| 870 | 1, 2 |
| 871 | 1, 3 |
| 874 | 1, 2 |
| 877 | 1, 3 |
| 878 | 1, 2, 5*, 6 |
| 879 | 1, 2, 5, 6 |

5. Defendant Tura L.P. has infringed the following claims of U.S. Patent 4,896,955 by sale of the following models of Turaflex eyeglass frames:

| Turaflex Model | Claims Infringed [2] |
| --- | --- |
| 841 | 1, 2, 5*, 6 |
| 868 | 1, 3 |
| 869 | 1, 2, 5, 6 |
| 870 | 1, 2 |
| 871 | 1, 3 |
| 874 | 1, 2 |
| 877 | 1, 3 |
| 878 | 1, 2, 5*, 6 |
| 879 | 1, 2, 5, 6 |

6. Defendant Brodart Co. has induced Tura LP to infringe U.S. Patents 4,772,112 and 4,896,955 and is therefore liable as an infringer.

7. Plaintiffs Marchon Eyewear, Inc., Marcolin USA, Inc. and Rothandberg, Inc. are collectively awarded damages, as against Defendants, Tura LP and Brodart Co., jointly and severally, in the following amounts:

| | |
| --- | --- |
| Lost profits for lost sales: | $2,944,024 |
| Lost profits for depressed prices: | $9,641,069 |
| **Total Marchon Damages:** | **$12,585,093** |

8. Plaintiffs Marchon Eyewear, Inc., Marcolin USA, Inc. and Rothandberg, Inc. are collectively awarded prejudgment interest at the following rates, compounded annually, calculated through the date of this judgment and order, as against Defendants, Tura LP and Brodart Co., jointly and severally: for 1989, 11%; for 1990, 9.69%; for 1991, 8.75%; for 1992, 6.55%; for 1993, 6.06% and for 1994–1995, 6.20%.

9. Plaintiff CVI/Beta, Ventures, Inc. is awarded damages, as against Defendants, Tura LP and Brodart Co., jointly and severally, in the following amounts:

| | |
| --- | --- |
| Royalty at 6% | $ 519,208 |
| Lump sum | $ 300,000 |
| **Total Beta Damages** | **$ 819,208** |

10. Plaintiff CVI/Beta, Ventures, Inc. is awarded prejudgment interest calculated at 1% above the prime rate, compounded annually, calculated through the date of this judgment and order, as against Defendants, Tura LP and Brodart Co., jointly and severally.

11. The infringement by Defendants Tura L.P. and Brodart Co. has not been proven to be willful.

12. Defendants' affirmative defenses are dismissed with prejudice.

13. Defendants' counterclaims are dismissed with prejudice.

14. Plaintiffs' claims against defendant Arthur Brody are dismissed without prejudice.

### ORDER FOR PERMANENT INJUNCTION AND ACCOUNTING

15. Defendants Tura LP and Brodart Co., their attorneys, agents, successors, or any person or persons in privity with any of them who receives actual notice of this Order, are hereby permanently enjoined until September 20, 2005 from making, using, selling or offering for sale in the United States, or

---

**1.** Elements of the claims marked with an asterisk were established pursuant to the doctrine of equivalents.

**2.** Elements of the claims marked with an asterisk were established pursuant to the doctrine of equivalents.

inducing others to make, use, sell or offer for sale, in the United States, Turaflex eyeglass frame Models 841, 868, 869, 870, 871, 874, 877, 878, 879, or other eyeglass frames essentially identical to the specific models found to infringe.

16. The foregoing injunction against Defendants shall take effect 48 hours after service of a copy of this Order upon attorneys for Defendants.

17. It is further ordered that Defendants Tura L.P. and Brodart Co., their attorneys, agents, successors and any person or persons in privity with any of them who receives actual notice of this Order, shall within 10 days of the date of this Order, deliver to Plaintiff Marchon Eyewear, Inc., at its place of business at 35 Hub Drive, Melville, New York, or to a representative designated by Marchon Eyewear, Inc., an inventory of all units of unsold Turaflex models 841, 868, 869, 870, 871, 874, 877, 878, and 879 and/or other nickel-titanium based shape-memory alloy frames in their possession, custody or control and specify the location at which such frames will be stored until the expiration of U.S. Patent No. 4,772,112 and 4,896,955 or otherwise disposed of consistent with the terms of this Judgment and Order.

18. It is further ordered that Defendants Tura L.P. and Brodart Co. shall, within 10 days of the date of this Order, provide an accounting to Plaintiffs and to this Court of all sales of Turaflex frames models 841, 868, 869, 870, 871, 874, 877, 878, 879 sold since September 30, 1994.

19. This Court shall retain jurisdiction of this action for purposes of enforcement of the provisions of the foregoing Order and for supplementation of the Judgment to include damages for sales of infringing eyeglass frames sold from September 30, 1994 to the date of this Judgment and Order.

**SO ORDERED.**